ALBANY,<br>
Dec. 1836.

Adams<br>
v.<br>
Rockwell.

---

### ADAMS v. ROCKWELL.

1. Where lands are described in a deed conveying the same, clearly and distinctly by courses and distances, so that upon actual survey the true location of the tract can be ascertained with absolute certainty, the *owner* may assert his title to hold according to the true boundaries of his lands, notwithstanding that an encroachment has been made upon him by the owner of an adjoining tract, a line maintained in pursuance of such encroachment, recognized by the party encroached upon, and *acquiesced* in by him for a period of *eleven years*, if the lands in dispute are in a state of nature, i. e. covered with timber, and no other occupation has been had of them, than the occasional cutting down of trees and drawing away of timber.

*It seems* that if during *such acquiescence*, expensive improvements by the erection of buildings or otherwise, had been made by the occupant upon the premises in dispute, the owner would have been held estopped from setting up the true line.

There was no evidence in this case of a deliberate settlement of the erroneous line by *express ageement*, founded upon a *bona fide* attempt to ascertain the true boundaries by *actual survey* according to the courses and disances of the older deed: both parties having derived their title from the same source.*

ERROR from the supreme court. Rockwell sued Adams in trespass *quare clausum fregit*, and for cutting down trees and carrying away saw logs. The defendant set up

---

* The *chancellor*, in delivering his opinion in this case, lays down the following *rule* as *applicable to cases of this kind:* "Where here can be no "real doubt as to how the premises should be located according to *certain* and

title in himself to the *locus in quo*. Both parties derived title from the same source, viz. George Gillmore, to whom, on the 13th December, 1785, was conveyed by the commissioners of forfeitures for the eastern district of this state, a tract of land of 2000 acres granted by letters patent to Edward Jessup and Ebenezer Jessup, which had been forfeited on their attainder. In the letters patent granted on the 10th April 1772, the *premises granted* are described as follows: " All that certain tract or parcel of land, situate on the east side of the Hudson river in the county of Albany and within the province of New York ; beginning in the south bounds of a tract of 7550 acres of land formerly granted to Ebenezer Jessup and others at the northeast corner of a tract of 350 acres of land granted to Richard Watcock and others, and running thence along the south bounds of the first mentioned tract of land east 178 chains, thence south 80 chains, thence west 98 chains, thence south 85 chains, to the north bounds of a tract of 4100 acres of land granted to the said Ebenezer Jessup and others, thence along the north bounds of the last mentioned tract of land west 80 chains to a tract of 200 acres of land granted to William Christie, thence along the east bounds of the said tract of 200 acres granted to William Christie, and along the east bounds of a tract of 350 acres of land granted to Edward

---

" *known boundaries* described in the deed, to establish a practical location
" different therefrom which shall deprive the party claiming under the deed
" of his legal rights, there must be either—a location which has been acqui-
" esced in for a sufficient length of time to *bar a right of entry* under the stat-
" ute of limitations in relation to real estate—or the *erroneous line* must have
" been *agreed upon between the parties* claiming the land on both sides thereof
"—or the party whose right is to be thus barred must have silently looked
" on, and seen the other party doing acts, or subjecting himself to expenses
" in relation to the land on the opposite side of the line which would be an
" injury to him, and which he would not have done if the line had not been
" so located ; in which case *perhaps a grant might be presumed* within the
" twenty years."

The *chancellor* also in his opinion disapproves of the evidence which was admitted at the trial, of the practical location of an *adjoining patent*, and of the possessions taken and held under the same. In which *Senator Maison*, who also delivered an opinion in this cause, concurs.

Quinn and others, and along the east bounds of the above mentioned tract of 350 acres of land granted to Richard Watcock and others north 165 chains to the place where this tract began, containing 2000 acres of land and the usual allowance for highways." The tract was described in the deed to George Gillmore with the same particularly as in the letters patent. George Gillmore died leaving six children, his heirs at law, five of whom, viz. his son *James Gillmore* and four of his brothers and sisters, on the 5th January, 1800, sold and conveyed to *Ananias Platt* five-sixths of a tract of 700 acres, part of the tract of 2000 acres, describing the 700 acres as follows: " Beginning at the southeast corner of the 2000 acre patent, and running thence along the east bounds of the said patent 37 chains and 76 links, thence west 98 chains, thence south 37 chains and 76 links, thence west 80 chains to the east bounds of Quinn's patent, thence south along the east bounds of Quinn's patent 45 chains 62 links, thence east 80 chains, thence north 45 chains 62 links, thence east 98 chains to the place of beginning." *John Gillmore*, one of the heirs at law of George Gillmore who did not unite in this conveyence, on the 20th June, 1805, conveyed to *Adams*, the defendant in this cause, an undivided sixth part of a small portion of the 700 acres described as beginning at the termination of the third course in the patent, and running thence west 27 chains, thence south 45 chains 62 links, thence east 27 chains, and thence north 45 chains 62 links to the place of beginning. In 1806 two individuals, named *Hay* and *Dorr*, became seised of the *five-sixths* of the 700 acres conveyed to Platt in 1800. In 1812 Adams became seised of a portion of those five-sixths, and between that time and the month of May, 1821, became seised of the whole of the five-sixths of the 700 acres. Thus it appeared that at the last date, viz. in May, 1821, Adams had title to *all* that part of the tract of 2000 acres which lays south of the termination of the third course of the patent, and extends south of that point a distance of 45 chains and 62 links, except such portion thereof as still remained in *John Gillmore*, the son of George Gillmore, who did not unite in the conveyance to Platt.

The three first courses and distances of the 2000 acres had been repeatedly surveyed, all of which surveys corresponded, and the *true south line* of the land owned by Adams under the conveyances obtained by him, at the distance of 45 chains and 62 links from the termination of the third course of the 2000 acre tract, was conceded to be where he claimed it to be. But the plaintiff contended that a different line had been established by the *location* of the owners of that portion of the 2000 acre tract which lay south of the true south line of the 700 acres, and that such location had been *acquiesced* in by the former owners of the 700 acres, and by Adams himself for such a length of time, that he was bound by the practical location and estopped from asserting his title down to the true line.

To establish the *practical location* contended for, the plaintiff proved that previous to the year 1800 the south line of the 2000 acre tract was established by actual location at a point 17 chains and 61 links short of its true southren boundary; that the line was thus established in fixing the boundaries between the 2000 acre tract and the tract of 4100 acres lying to the south thereof, and between Christie's patent and the 4100 acres, and that the possessions upon *the several tracts have since been held in conformity to such line.* This evidence was objected to by the defendant, but received by the circuit judge. The plaintiff then gave in evidence a deed from five of the children and heirs at law of *George Gillmore,* to his remaining child and heir at law, viz. *James Gillmore,* bearing date 29th September, 1802, conveying to the grantee 150 acres of land, and intending to convey the eastern half of the 300 acres lying south of the 700 acre tract, (the other 1000 acres of the 2000 acre tract lying to the north of the 700 acre tract.) This tract of 150 acres was *bounded on the south by the north bounds* of the 4100 acre tract, the length of chain north and south given in the deed being 39 chains and 38 links, and the length of chain east and west being 40 chains. The deed to James Gillmore recognized *James Gillmore* and *John Law* as the owners of the 150 acres lying to the west of the premises conveyed, and it was subse-

quently shown that, in September, 1805, *Law* released his share of that tract to *James Gillmore*, his co-owner. After James Gillmore obtained his deed of the 29th September, 1802, he conveyed 100 acres, or two-thirds of the 150 acres, off of the easternmost side of the lot, to his brother *John Gillmore*, who, on the 7th April, 1807, conveyed the same to Thomas Lee and William Stevenson. On the 5th November, 1821, James Gillmore conveyed to his sons James, Alanson and John the *remaining* 50 acres of the 150 acre tract of which he obtained a deed in September, 1802, and they, on the 4th December, 1821, entered into a contract with *Rockwell*, the plaintiff in this cause, whereby they agreed that Rockwell should have the privilege of taking off all the pine timber standing and growing upon the 50 acres; for which he agreed to pay them $80 per acre, and for $20 to be deducted from the consideration money, agreed to assume the risk of any claim that *Adams*, the defendant in this cause, might have to the timber. After exhibiting his paper title, the plaintiff proved that the north bounds of the 300 acres thus owned by James Gillmore, according to the distance given in his deeds, measuring from the dividing line between the 2000 and 4100 acre tracts as settled previous to 1800, would extend 17 *chains and* 61 *links* north of the *true south line* of the 700 acre tract, and to show a *location* up to that line, the plaintiff proved in respect to the *western* 150 acres, that as long since as 1803, James Gillmore sold the timber growing on the north end of the 150 acres to Thomas Lee, who, in the same year, cut logs and carried them away; and that, in 1815, Gillmore sold and conveyed the land itself to one Aldrich, the son-in-law of the defendant who resided in the neighborhood, and that Aldrich has ever since held up to that line. . In respect to the *eastern* 150 acres, it was shown that Lee who purchased the easternmost 100 acres thereof in 1807, always claimed up to the same line to which Gillmore claimed, and which, on the trial, was called the *Parish* or *Rockwell* line, and that Lee, previous to 1814 or 1815, had cut off the principal part of the timber north

ALBANY,
Dec. 1836.

Adams
v.
Rockwell.

of the defendant's line. In 1810 Hay and Dorr, whilst owners of two-thirds of the 700 acre tract, and whose title has since been acquired by the defendant, caused a survey to be made for the purpose of making a division of the timber, and in such partition assumed the *Parish* or *Rockwell* line as the southern boundary of the 700 acres. In 1814 the defendant *Adams* repeatedly pointed out and declared the *Parish line* to be the boundary between the 700 acre tract and the 300 acre tract lying south of it, and aided in designating the line, and erecting a division fence on that line at the north end of the *western* 150 acres, and, in the year 1821, directed the erection of a fence on his own land opposite the eastern 100 acres on a line corresponding with the fence erected at the north end of the western 150 acres ; and it was proved by a number of witnesses residing in the neighborhood, that the *Parish line* was generally understood to be the division line between the 700 and 300 acre tracts, and that they had never heard *Adams* claim that the line was elsewhere until a dispute arose in respect to the line about the year 1820 or 1821. In the latter year *Adams* caused a survey to be made, and when it was completed, and it was demonstrated that the true south line of the 700 acres . was 17 chains · and 61 links south of the Parish line, he expressed his *surprise* that his lands extended so far south. In opposition to this evidence, however, it was proved that in 1807, whilst Hay and Dorr were owners of part of the 700 acres, they procured between 906 and 1500 logs to be cut on the *western* 150 acres south of the *Parish line*, which were taken away ; that upon one of the occasions when Adams, in 1814, pointed out the *Parish line* as the boundary between the two tracts, he at the same time pointed out the termination of the third course of the 2000 acre tract, and stated the length of chain which his title would permit him to go south, and complained that he had not his full complement of land, but did not claim to have a right to go further south than the *Parish* line ; and that on the 15th November, 1820, he commenced an action of *tresspass* against Lee for cutting timber on the land north of the true south line of the 700

ALBANY,
Dec. 1836.

Adams
v.
Rockwell.

acres; and that, within a year or two previous to such suit, he had frequently forbidden Lee to cut timber on the land in dispute.

The *locus in quo* in this case is that portion of the 50 acres conveyed by James Gillmore to his sons, James, Alanson and John, which is bounded on the *east* by the 100 acres purchased by Lee and Stevenson from John Gillmore, on on the *south* by the true south line of the 700 acre tract, on the *west* by the western 150 acres, and on the *north* by the Parish line ; its width east and west is the one-third of the width of the eastern 150 acres, which is 40 chains, and the width of the western 150 acres is also 40 chains. This portion of the eastern 150 acres was principally covered with timber, was not cultivated, and was not separated from the lands lying north of it by any fence. In 1818 or 1820, *Seth Aldrich*, the son-in-law of Adams, was employed by James Gillmore, to cut logs on the 50 acre lot, and he accordingly cut about 700 logs, a portion of which were cut north of Adam's south line. Aldrich however testified, that he could not say that Adams knew that any portion of the logs were cut north of his line.

The counsel for the defendant requested the judge to charge the jury, that the evidence adduced by the plaintiff was not sufficient to authorize the finding of a location and the establishment of a line variant from the *true line*, and that at all events, to entitle the plaintiff to recover, he ought to have shown an *acquiescence* on the part of the defendant and of those under whom he claimed, in the *erroneous line*, for the period at least of *twenty years*. The judge declined to do so, and charged the jury that, from the evidence adduced, they would be warranted to come to the conclusion that the line claimed by the defendant was the true south line of the 700 acre tract ; but that the question for them to decide in this case was, whether there had not been a practical location' fixing the boundary between the 700 acre and the 300 acre tracts at the line claimed by the plaintiff, which would estop the defendant from setting up the true line. He instructed them that the acts and declarations of parties, as to the location of lands, controlled the courses

and distances in their deeds; that to give operation to such acts and declarations, it was not necessary that the party doing the acts or making the declarations should know the effect of such location, and that *acquiescence* in an erroneous location for a great length of time is conclusive upon the question. That if they should find in this case a *location* of the north line of the 150 acres on the *west* as claimed by the plaintiff, and of the north line of the 100 acres as claimed by *Lee* on the *east*, and a *recognition* of such line by the defendant and those under whom he held, such location and recognition was evidence of the *continuation* of a line at the north end of the 50 acres, *corresponding* with the north lines of the two tracts of 150 and 100 acres, and they would be warranted in so finding. To which charge the counsel for the defendant excepted. The jury found a verdict for the plaintiff.

This cause was tried at the Warren circuit, in June, 1829, before the Hon. Esek Cowen, then one of the circuit judges. In the preceding year an action of *replevin* between the same parties had been tried before the same judge, involving substantially the same questions, and in which a similar charge was given to the jury, to which also an exception was taken. Judgments were rendered in each case in favor of *Rockwell,* and *Adams* sued out writs of error. See the *opinion* delivered in the supreme court, 6 Wendell, 467.

The cause was argued in this court by

*D. Russel & S. Stevens,* for the plaintiff in error.

*M. T. Reynolds,* for the defendant in error.

*Points submitted on the part of the plaintiff in error.*

I. There was no evidence which would authorize the jury to find a practical location of any part of the south line of Adams' land different from the true south line thereof, which would restrict him from asserting his title (which was full, clear, and undisputed) to the full extent of his grant. The circuit judge erred, therefore, in refusing so to charge the jury, and also in submitting the question to the jury to find whether there had been such location or not.

The question arising in this case *is not* as to the effect of a practical location of a line, by express agreement, by the parties owning on each side, for the purpose of settling a doubtful and disputed line, as in the case of *Jackson* v. *Van Corlear*, 11 Johns. R. 123. There is no pretence of any such fact in this case; nor is it a case where a party with a full knowledge of his rights has fixed upon a line short of that which his deed would give him. The question of what would be the legal effect of an acquiescence in such a line for a period short of 20 years does not arise, because no such fact was proved or pretended on the trial, or submitted to the jury; but on the contrary was expressly excluded from the jury.

1. The legal question presented under this point, upon the strongest view of the facts that can be taken against the plaintiff in error, is whether a party who has a clear and conceded title to land (there being no ambiguity or uncertainty, as to its location by the terms of his grant,) can be precluded from asserting that title to its full extent, by an acquiescence through ignorance as to the extent of title, or mistake of his rights, in an erroneous location of a boundary line for a less period than 20 years.

On the part of the plaintiff in error it is submitted that " where there is no ambiguity or uncertainty as to the location by the terms of the grant, an erroneous location of a line made by a party through ignorance or mistake as to the true extent of his title, without any fraud or bad faith, does not preclude him from afterwards asserting his claim to the extent of his title, unless those on the opposite side of the line thus erroneously located have in good faith *claimed* and pos-sessed up to such line for at least 20 years; much less will an *acquiescence* short of that period by one through ignorance or mistake of his rights, in an erroneous location of a line made by his adversary (as in this case) divest him of his title, or preclude him from asserting it."

To constitute a practical location of a line under such circumstances, which is to divest a party of a clear and conceded title, such line must have been *clearly defined*, and *claimed* and *possessed to*, in good faith on the one side, and peaceably acquiesced in on the other for at least 20 years.

ALBANY,
Dec. 1836.

Adams
v.
Rockwell.

None of the cases previous to the one first decided between these parties, 7 Cowen, 762, recognize a less period as being ·sufficient to control the true extent of a grant. In *Jackson* v. *Bowen*, 1 Caines, 358, 362, the acquiescence by the plaintiff was 36 years, with a full knowledge of his rights; the court say he ought not, perhaps, to be precluded by this acquiescence if there were circumstances inducing *a suspicion* of imposition and ignorance. In *Jackson* v. *Dysling*, 2 Caines, 197, acquiescence was 40 years. In *Jackson* v. *Vedder*, 3 Johns. R. 8, 12, there had been an amicable partition and possession according to it for 40 years. In *Jackson* v. *Dieffendorf*, 3 Johns. R. 269, acquiescence was 38 years. In *Jackson* v. *Ogden*, 7 Johns. R. 240, 1, the grant was *uncertain and ambiguous as to its location*, (see p. 241.) A location was made by actual survey, and acquiesced in by the claimant and those under whom he held for 17 or 18 years. The plaintiff had also recognized the location by purchasing under defendant's title, and taking a deed recognizing the lines thus located. The court refused to set aside a verdict for the defendant, and said the plaintiff ought to be left to commence a new action. Van Ness, J., dissented, p. 245, and it is upon this dissenting opinion that the supreme court rely for the doctrine which they held in the present case. In *Jackson* v. *Douglass*, 8 Johns. R. 367, the plaintiffs admitted the line to be at a place designated by them which they pointed out to defendant when he took possession. Defendant built a fence on the line thus pointed out as a line fence, which line was occupied to on each side for 8 years; held that plaintiffs were not precluded from asserting their title beyond this line. In *Stuyvesant* v. *Dunham*, 9 Johns. R. 63, defendant had title by adverse possession for more than 25 years; held that a parol agreement to straighten the line and put a fence upon the true line, did not deprive defendant of the title thus acquired by adverse possession, and that the plaintiff was a trespasser for putting the fence upon the line agreed upon; defendant having, before the fence was built, objected to its being built. In *Jackson* v. *Smith*, 9 Johns. R. 100, the original patentee, by the terms of his patent, was to designate 400 acres for the

use of the gospel; he did so designate it by a survey, under his own personal inspection, and acquiesced in it for more than 26 years; held that he could not, after that, vary the location of the gospel lot. *Jackson* v. *McCull,* 10 Johns. R. 380. The line in this case had been established by the ancestor of the plaintiff, 41 years before the trial, which had ever since been recognized, and acquiesced in, and improved up to, as the true line by all parties; held that the plaintiff, after such a lapse of time, was excluded from disputing the line. *Jackson* v. *Freer,* 17 John R. 31. This suit was commenced in 1818. The proprietors of the patent had partitioned the same between them by an actual survey of the same into lots, marking the lines and corners on the ground; this partition had been acquiesced in through a series of transfers, for a great number of years, ever since the first settlement of the country and more than twenty years; held that the parties to the partition and those claiming under them could not dispute these lines or call in question the accuracy of the partition. None of these cases recognize an acquiescence in an erroneous line for a less period than 20 years, as sufficient to preclude either party from insisting upon the true line, and all the cases seem to intimate that it requires a longer period than that. It is therefore submitted, that at most such a location can only be deemed the foundation for the commencement of an adverse possession. *Dogan* v. *Seekright,* 4 Hen. & Munf. 130. 2d and 5th rules laid down in that case, and consequently an acquiescence in such erroneous location must in this state be continued at least 20 years to become conclusive upon the parties.

2. To establish a practical location which is to divest a party of a clear and conceded title by deed, the extent of which is free from all ambiguity or doubt, the evidence of the establishment of such location should be clear, positive and *unequivocal.*

3. The testimony to establish such location in this case is not of that character. It is doubtful and equivocal, and by a just and proper construction disproves, in fact, that there ever was any such location of a line as that contended for

by the defendant in error, or of any other line different from the true line.

4. But the strongest possible view which can be taken of the evidence, if every thing doubtful is to be taken most strongly against the true line, it only makes out a case of an acquiescence by Adams in this erroneous line of 11 years. The part of this line which was located the earliest, and consequently which has been acquiesced in the longest, is that part of it between Adams and the Lee lot. Lee got his title to that lot in 1807; in 1818 Adams prosecuted him for cutting timber north of the true line. The present suit was commenced in 1821, and was tried the last time in December, 1829.

II. The circuit judge erred in admitting evidence to show an erroneous practical location of the north line of the 4100 acre patent.

III. If there were a practical location of a line to the extent of the Lee lot on the east, and of the Parish lot on the west of the premises in question, it would not constitute a practical location of that line as to the premises in question.

IV. Adams had title to and was in possession of the premises in question, at the time Rockwell purchased from the Gillmores, and he purchased with a full knowledge of that fact; such purchase was in violation of the act to prevent champerty and maintenance, and therefore void. 1 R. L. 172. *Tomb* v. *Sherwood*, 13 Johns. R. 291. *Whitaker* v. *Cone*, 2 Johns. Cas. 58.

*Points submitted on the part of the defendant in error.*

1. Adams and those through whom he derives title to the premises in question, have recognized and long acquiesced in the Parish line. They have admitted it to be the true line—permitted titles to be acquired—houses to be erected—lands to be cultivated and possessed—orchards to be planted; and other valuable and lasting improvements to be made to the south of the Parish line. The law, therefore, as well as equity and sound policy, will not permit them now, to set up a different line, extending their claim farther south than the Parish line.

ALBANY,
Dec. 1836.

Adams
v.
Rockwell.

2. The jury were warranted in presuming that the Parish line was established and agreed to, at the time of the division, about the year 1805, by James Gillmore, who then owned the Aldrich lot, and by John Gillmore, Hay, and Dorr, who then owned the 700 acres. This, as well as the question involved in the first point, were questions of fact for the jury, and were properly left to their decision.

3. All the decisions of the judge were correct. But if he erred at all, he did so only in the decision of questions of minor importance, not affecting the merits, nor altering the verdict, nor judgment, to which Rockwell is entitled.

4. The line to which Adams claims was never heard of until a survey made in 1811. It did not extend more than half way across the patent; and has never been acted upon by the plaintiff in error; nor by those through whom he derives title; nor been recognized, nor acquiesced in by the defendant in error; nor by those through whom he derives title.

5. The judge was correct in receiving the evidence given respecting the north line of the 4100 acre patent. It was not offered for the purpose of binding the plaintiff in error by the acts or recognitions of the persons interested in the line; but for the purpose of locating the premises (the 150 acres) conveyed to James Gillmore by the other heirs—showing the place of beginning according to the understanding of the parties to that deed—the length of chain in that deed just reached the parish line—and the premises conveyed covered the premises in question.

6. The judge was correct in deciding that a recognition of the parish line east and west of the premises in question, was a recognition of the whole line. But if not so, there was abundant evidence of the recognition of that line as a whole and entire line. Adams admitted it to be the true line. It was recognized and established as the true line by the parties interested on both sides, at the time of the survey and division of the Parish lot, and the three other lots.

7. There was no adverse possession. The plaintiff in error entered for the purpose of cutting the timber—not

with the view to occupy or possess the premises. He was a trespasser in so doing.

The following opinions were delivered:

By the CHANCELLOR. The first of these causes is an action of *trespass* brought by Rockwell against Adams, and the men in his employ, for cutting timber upon the premises in controversy; and the other an action of *replevin*, to recover possession of the timber cut upon the same premises. The facts in both cases are substantially the same and the decision of one determines the other.

I do not perceive that the facts in either case, and the bill of exceptions thereon, present the question whether it was competent for Rockwell to make a contract for the purchase of the timber on the land in controversy, so as to vest any right in himself, while Adams was in the actual possession thereof, cutting the timber, and claiming to hold the premises adversely to the Gillmores under the deed of 1800 to Ananias Platt, from whom it is admitted Adams had derived a prior title to the premises, unless he has precluded himself from asserting his rights by a practical location of the land, conveyed to Platt, in such a manner as to make it conclusive against him. At the time when the motion for a nonsuit was made, the admission as to Adams' prior title to the north 1700 acres of the patent had not been made, and no evidence of such title had been produced. Neither did it appear from the evidence which had then been given, that Adams was in possession of, or was cutting the timber upon the premises under an adverse claim of right, on the 5th of December, 1821, when the contract with the Gillmores, for the purchase of the timber, was made. The contract shows that Adams then claimed the lot, but not that he was in possession thereof; and the witness who had testified, previous to the motion for a nonsuit, as to Adams and the persons in his employ being in possession of the premises, and cutting timber there, speak of a time which was subsequent to the purchase of the timber from the Gillmores, and when Rockwell went to

measure the land according to the stipulation contained in the contract, for the purpose of ascertaining how many acres of timber there were upon the lot. The motion for a nonsuit was, therefore, properly overruled at that time. It does not appear from the bill of exceptions in either case, that the question as to the legality of the contract, on the ground of adverse possession, was ever afterwards presented for the decision of the circuit judge, or that he was asked by the defendant's counsel to give any instructions to the jury as to the law on that point. It, therefore, is not material to inquire whether any evidence of such adverse possession by Adams was given subsequently to the decision of the motion for a nonsuit.

The evidence as to the practical location of the north line of the adjoining patent, by showing that the possessions had been taken and held up to the false line for such a length of time that they could not now be disturbed, appears to be improper, as it could not in any way alter the legal rights of Adams, who was not bounded upon the 4100 acre patent; and the location of whose land, under his deeds, must necessarily be the same whether the north line of the adjoining patent was in the one place or in the other. The introduction of such evidence and permitting it to go to the jury without explanation, was calculated to mislead and to divert their attention from the true question in issue between the parties. It was also calculated to induce the jury to suppose that the location of Adams' land under his deed had some connection with the established possessions of other persons claiming under the 4100 acre patent, and that the location of his land in the manner in which his counsel insisted it should be or had been made, might in some way disturb those ancient and established possessions,

As to the question whether there had been such a practical location by Adams of the land to which he was entitled, and which it was admitted his deeds actually covered, I think the court below erred in supposing that there was any evidence in this case, which could legally authorize a jury to find that either Adams or those under whom he

claimed had deliberately settled and established a line north of the premises in dispute as the true southern boundary of the 1700 acres of the north part of the 2000 acre patent, and acquiesced therein for such a length of time as to preclude him from claiming that part of the land actually covered by his deed which had not been possessed adversely by any other person. It is hardly necessary that I should go into a long analysis of the evidence in these causes to show that neither Adams or those from whom he derived his title have done any act which can legally deprive him of the land to which he has shown a perfect right by written conveyances, and give it to those who never had any color of right to the same either by adverse possession or otherwise. In the first place, I think, the evidence clearly establishes the fact that there was an ancient line running across the patent south of the premises in dispute, corresponding substantially with the true south line of the 1700 acre tract to which, it is admitted, Adams' elder title extended, and to which he now claims. This line was probably run about the time of the giving of the deed to Platt, in 1800, for the 700 acres of which it formed the southern boundary. Webster, the surveyor, and Aldridge and Weston, who were assisting both him and Kellogg in their surveys, all testify that this was an old line; but as the land was considerably burned over in 1816 or 1817, it was difficult to ascertain its correct date. Weston boxed one of the trees, and found the annulations, subsequent to the time when it was marked, to be fourteen; but whether this was one of the trees which had been killed by the fire in 1816 does not appear. If it was, the number of grains would correspond with the date of the deed of the 700 acres to Platt, in 1800. That this line had been actually run previous to the conveyance from Hopkins and his partner to Adams, in January, 1812, is proved by the testimony of Hopkins himself, who swears that he and his associates employed Hoffman to run out the land for them before that time, and that they either found the old corner or made a new one at the east end of the line to which Adams now claims; and Church proves that there was a

regularly marked line at that place, which he showed to McMillan and McDonald at the time they cut logs there twenty-two years before the trial, which would make it as early as 1807. Here there was a practical location of the lot conveyed by the Platt deed, according to the true location thereof, soon after that conveyance was made; and if any other line has since been recognized by Adams as the true line, it is evident that recognition must have originated altogether in mistake. The Gillmores, therefore, who had been in no way prejudiced by that mistake, could not take advantage of it to deprive him of his land to which they had no title. There is no doubt, however, that another line has been run at a pretty early day either across the whole patent, or at least the width of the 100 acres claimed by Lee. Perhaps as to some part of the land lying between this and the true line of Adams' lot as originally and correctly located, it may have been actually possessed so long, under color of title, as to deprive Adams of his rights by adverse possession; but even if that be so, it cannot operate to deprive him of his rights to the land in controversy, where the timber for which these suits were instituted was cut; which land was wholly wild and uncultivated at the time this controversy originated, in December, 1821. The false line north of the premises in controversy is very easily accounted for; as it was probably the mistaken act of Lee, or some of the other persons whose deeds were bounded upon the south line of the patent, and which were subsequent in date to the deed to Platt, under which Adams has derived his title. It appears by the testimony, that by some mistake the north line of the patent adjoining this patent of 2000 acres on the south, had been run about 17 chains too far north; and Lee and the other persons whose deeds were bounded by the south bounds of the two thousand acre patent, have undoubtedly by mistake commenced running at this false line instead of the true south line of the patent, and have thus extended their lines 17 chains too far north, so as to embrace therein a part of the lands previously deeded to Platt; and as the land north of Adams' true line was wild and uncultivated for a

considerable part of the distance, the mistake was not immediately discovered. Adams himself, as it would appear from the evidence, has sometimes mistaken this northern for the true line; although it appears from the testimony he sued Lee for cutting north of the true line as early as 1818. When the parties were dividing their timber upon the Platt lot some years previous to that time, it is very probable that the owners of the timber mistook this false line for the true line, and divided the timber among themselves accordingly; though it does not appear that they divided the timber as far east as the premises in dispute here. But whatever the owners of the Platt lot may have done as between themselves, as there was no agreement between them and the persons claiming under the deeds bounded upon the south line of the patent, to have that settled as the true line between them, and as the true line had been *actually run and marked upon the land* long previous to that time, there is no principle of law or justice which can take from Adams the land which actually belongs to him under his deed, and gave it to those who never owned it, and who have lost nothing by his *mistake* as to the true line. The plaintiff in these suits is not entitled to any extension of legal rules for the purpose of giving him the timber on lands belonging to Adams, if he has not obtained any legal title thereto under his contract with the Gillmores; as it appears upon the face of the contract itself that he knew the premises in controversy were claimed by Adams as his property, and expressly assumed the risk of this litigation in his contract of purchase. Where there can be no real doubt as to how the premises should be located according to certain and known boundaries described in the deed, to establish a practical location different therefrom, which shall deprive the party, claiming under the deed, of his legal rights, there must be either a location which has been acquiesced in for a sufficient length of time to bar a right of entry, under the statute of limitations in relation to real estate; or the erroneous line must have been agreed upon between the parties claiming the land on both sides thereof, or the party whose right is to be thus barred must

have silently looked on and seen the other party doing acts or subjecting himself to expenses in relation to the land on the opposite side of the line which would be an injury to him, and which he would not have done if the line had not been so located; in which case perhaps a grant might be presumed within the twenty years. There is no pretence in this case, that any such state of things exists in relation to the wild and uncultivated strip of land which is the subject of controversy here. The utmost that can be said of it is that the lot of Adams had been correctly located upon the land according to its true bounds, and that the land of the Gillmores had been incorrectly located partly upon the land of Adams, if the false line across that 50 acres ever was in fact run, of which there is certainly much doubt; and that while the lands of both parties opposite the premises in dispute were wild and uncultivated, Adams has, on two or three occasions, mistaken the false line for the true one. Upon such a state of facts I am satisfied the defendant could not be deprived of his property without violating all the rules of law by which the rights to real estate are secured to the owners thereof; and that the judge instead of telling the jury they were authorized to find upon these facts that there had been a practical location sufficient to deprive the defendant of his land and timber, should have instructed them that there was no evidence in the case from which the law would raise a presumption that he had released or abandoned his property so as to vest a legal title to the same in those under whom the plaintiff claimed

I think the judgments of the supreme court should be reversed; and that in the *replevin* suit the proceedings should be revived against the personal representatives of Rockwell, and a *venire de novo* awarded in that court.

By Senator MAISON. At the trial it was insisted that the contract between Rockwell and the Gillmores was void, because Adams was in possession, claiming the premises and because the purchase by Rockwell was in violation of the 1st and 3d sections of the act to prevent champerty and maintenance. However much the conduct of Rock-

well manifests a determination to have a lawsuit with Adams, and which certainly places him in no very commendable view before this court, yet the circuit judge very properly denied the nonsuit, as the act of Rockwell, in his purchase of the timber does not come within the letter or spirit of either of those sections.

It is distinctly admitted in the bill of exceptions, that the *fee* of the *locus in quo* is in Abijah Adams, but it is insisted that he has lost his right, or is barred from urging it, by reason of a location, and an acquiescence therein for a number of years, either by himself or by those under whom he claims. To deprive a man of his absolute right to the unquestioned fee of his land, according to the doctrine of the courts, regardless of, or according to the construction which they have given to the statute for the prevention of frauds and perjuries it should appear most clear and distinct, without the shadow of a doubt, and by testimony the most convincing and satisfactory, that there was an express agreement made between the owners of the adjoining lands, deliberately settling the exact precise line or boundary, or location between them, and an acquiescence therein for *a considerable time;* or in the absence of proof of such agreement, it should be as clearly, distinctly and satisfactorily shown, that the party claiming has had possession of the lands claimed, up to a certain, visible, known line, with the express knowledge and assent of the owner of the adjoining land, and his acquiescence in such possession, adverse to, and in defiance of his rights—and this for a *considerable time.* What this considerable time is, has not been limited or defined, is quite vague and uncertain, and must necessarily depend upon the particular circumstances of each case. But of this I may have occasion to remark hereafter. Chief Justice Savage, in *McCormick* v. *Barnum,* 10 Wendell, 104, says, " Cases of this description (cases of location and acquiescence) have been frequently before the court. The principle upon which they have all been decided is, that where parties agree upon a division line, either expressly or by long acquiescence, such line shall not be disturbed; buildings and permanent improvements may be made upon the faith of the

location of the line ; transfers may be made, and to permit
such lines to be altered might be productive of incalculable
injury." Again, in *Kip* v. *Norton*, 12 Wendell, 127, he re-
peats the doctrine; " an assent to a location," he says, " must
be either express or implied.  If there is a disputed line be.
tween two adjoining proprietors of land, it may be settled
between them by a location, made by both or made by one,
and acquiesced in by the other for *so long a time* as to be
evidence of an agreement to the line.  There can be no
doubt," he adds, " that an express parol agreement to settle
a disputed or unsettled line is valid, if executed immediately,
and possession accompanies and follows such agreement.
So also where there has been no express agreement, long
acquiescence by one in the line assumed by the other, is
evidence of an agreement.  So in *Jackson* v. *Corlear*, 11
Johns. R. 123, the court say : " After the parties have *delibe-
rately settled* a boundary line between them, it would give
too much encouragement to the spirit of litigation, to look
beyond such settlement, and break up the line *so established*
between them.  In *Jackson* v. *Dysling*, 2 Caines, 201, Mr.
Justice Livingston said, " the defendant's possession is *not
only adverse* to the lessor's claim, but commenced with *his*
or *his ancestor's consent*, and therefore ought not to be dis-
turbed."

It is not pretended that either James Gillmore the elder,
or James the younger, or his brothers Alanson and John, or
Lee and Stevenson, or either of them, ever entered into any
agreement with Adams, as to the particular line which
should be considered the dividing line between them.  No
express agreement whatever was made between them, or
those under whom they claim, as to the locations of either.
The circuit judge who first tried this cause was of opinion,
that before Adams could be deprived of his land, it was ne-
cessary for the claimant to show that Adams had agreed to
a location, such as contended for by the claimant ; and the
jury found that no such agreement had ever been made.
The supreme court, 7 Cowen, 761, held that an agreement
was not necessary to be proved ; that " acquiescence *for a*

*length of time* was evidence of such agreement;" and they sent the cause back for a new trial; thereby giving the party claimant an opportunity of showing that Adams had acquiesced in a location as contended for by Rockwell. Upon the second trial, a mass of testimony was taken, with a view of showing such an acquiescence as would amount to, or be evidence of such an agreement, as would justify the taking away from Adams his land, to which he has an acknowledged, perfect, legal title. "It is not to be controverted," says Spencer, justice, in *Jackson* v. *Ogden*, 4 Johns. R. 143, "that parties, whose rights to real property may be perfect, and the boundaries of which may be susceptible of certain and precise ascertainment, may by their acts conclude themselves, by establishing other and different boundaries." I apprehend that the learned judge meant to be understood, that those acts are to be as certain, palpable, unequivocal and precise, which will take away from a man his property, as the boundaries are susceptible of certain and precise ascertainment; *id certum est quod certum reddi potest.* It here becomes necessary to analyze the evidence, in order to ascertain what acts have been done by Adams, which go to take away his rights, and what location has been made by the claimants, with the knowledge of Adams, and in which he has acquiesced for *a considerable time*, or for *a length of time*, as the language is in the books. In this examination I shall lay out of view altogether the evidence in relation to the location of the south boundary of the 2000 acre patent, which is the north boundary of the 4100 acre patent, and this for reasons which I shall hereafter explain; confining myself to such acts as may have been proved, and such location as is insisted has been made. [Senator MAISON here went into a minute examination of the evidence given by the witnesses produced on the trial, and concluded by observing, "This finishes the testimony to the extent that I designed to examine it, and in my judgment there is a total failure in establishing any thing like a *location* of the premises, different from that established by the deeds—or in showing an *acquiescence* on the part of Adams, or of those under whom he claims, in any other location or line than

that which is denominated the true south line of Adams' land." He then proceeds as follows:] Indeed the counsel for Rockwell well considered that their case was hopeless without the aid of other and further testimony. Before, however, going into this offered and admitted additional testimony, let us examine whether this case comes within any of the cases which have been adjudged in the supreme court, in relation to the doctrine of location and acquiescence ; premising, however, that the acts testified to by Nathan Durkee and Isaac Coman, which are intended as evidence of location, took place twelve years before the commencement of this suit, and that there is not a particle of evidence in the case to show, that the Gillmores or Lee, or any one else peaceably possessed, with the knowledge and acquiescence of Adams, any of the land in question north of Adams' true south line.

The first case to be met with on this subject, is that of *Jackson* v. *Brown*, 1 Caines, 362. This case was grounded on an adverse possession of 36 years. Mr. Justice Thompson said, " admitting the deed to cover the land, still the plaintiffs and those under whom they claim have *abandoned* it for such a length of time, as to preclude them from a recovery, at least in this form of action. It is true, a man may be mistaken with respect to his title, and perhaps ought not to be concluded by his confession, if made under circumstances inducing a suspicion of imposition or ignorance, neither of which appear in this case ; and when acquiesced in for the length of time as in the present case, he ought to be concluded. The parties having been in possession of the premises for at least 36 years, claiming and using them as their own, *adversely* to any other claim, and with such repeated recognitions, &c. as to *show conclusively* that *they disclaimed* having any right or title, is sufficient to rebut any presumption of tenancy." The next case is *Jackson* v. *Dysling*, 2 Caines, 201. This was a case of adverse possession of 40 years, Livingston, justice, said ; " But for the new line run in 1789, and the *parol agreement* then made, it is not pretended that the plaintiff can recover ; for the parties claiming these lots having no less than 40 years ago

Adams
v.
Rockwell.

*determined* on the line between them, by running the same, and having held their possessions accordingly ever since, no court would permit either of them at this late day to disturb the other. The defendant's · possession is *not only adverse* to the lessor's claim, but commenced with his or his ancestor's consent." In the case of *Jackson* v. *Vedder*, 3 Johns. R. 12, the court say : " The survey was made for the proprietors, and if possessions have been taken, and held accordingly, the proprietors and those claiming under them, ought certainly, after a lapse of 40 years, to be concluded from contesting with each other the correctness of the *actual locations.* In *Jackson* v. *Dieffendorf*, 3 Johns. R. 269, Van Ness, justice, in delivering the opinion of the court, inquires : " Shall a possession of 38 years be disturbed, because, from a recent survey, it appears not to correspond with the partition deeds executed 60 years before ? A location made in 1765, and probably in exact conformity to the survey made on the partition in 1774, and *quietly suffered to be continued* by the proprietor of the adjoining lot until 1803, is and ought to be final and conclusive."

The statement of the facts in the case of *Jackson* v. *Ogdens*, 7 Johns. R. 242, showing what acts, in judgment of law, amount to location and acquiescence, is thus briefly made by Chief Justice Kent ; " When McCall took possession of the premises, under his purchase from Harper in 1793, the Hawleys (under whom the lessor claims) were in possession of lot No. 16, and they said that a certain hemlock tree was their boundary. This hemlock tree was one of the corners of lot No. 16, according to the original survey, and in exclusion of the premises. The premises lay northwest of this boundary, and James Hawley told a witness *where his line extended to, and that it did not extend to the premises.* These were the declarations, of the owner of lot No. 16, cotemporary with the purchase and settlement of the premises by McCall. The next owner of lot No 16 was Freeman, whose title commenced in 1795, and he said that the *land which the defendant was on was a vacant lot.* Griswold, one of the lessors of the plaintiff, and who was in possession of lot No. 16 as early as 1797, *accepted a covenant under*

*seal from the defendants, by which they agreed to sell to him 50 acres, being part of these same premises ;* and Griswold afterwards said, *that he had this possession from the defendants."* The court refused to disturb a possession of 18 years after such certain, unequivocal acts of positive recognition and acquiescence. In *Jackson* v. *Douglass,* 8 Johns. R. 367, a possession of 40 years, and in *Jacobson* v. *Smith* 9 Johns. R. 100, a possession of 26 years was not allowed to be disturbed ; both being adverse, and acquiesced in by all parties. So the case of *Jackson* v. *McCall,* 16 Johns. R. 380, rests upon an adverse possession of 41 years. The case of *Jackson* v. *Van Corlear,* 11 Johns. R. 123, is the next in order. In that case the parties who owned the land 19 years before the trial *agreed upon* the line of division, which had been repeatedly acquiesced in ; and within 10 years the lessor and the defendant had mutually supported the division fence thus agreed upon—the court would not break up the line so established. Spencer, chief justice, in the case of *Jackson* v. *Frear,* 17 Johns. R. 31, says, " The patents were issued on the *mutual agreement* of those interested in the whole tract, to secure their common rights, and thus *the agreement* was carried into complete effect. The survey of the lots, and the *actual location* of them, was the joint act of all the parties interested, and must control. The map was intended to represent the relative situations and localities of the lots as regarded each other, the actual survey was the practical location." Possession was had accordingly for more than 20 years, and the possession was not allowed to be disturbed. Then in order comes the case between these parties in 7 Cowen, 762, and again in 7 Wendell, 761. In the case of *McCormick* v. *Barnum,* 10 Wendell, 104, the next in order of time, it appeared, and so said Chief Justice Savage, that " the line was acquiesced in for more than 20 years. The defendant had early built a house upon the premises in question, and the plaintiff's agent must have seen it. There is clearly, therefore, such a recognition and acquiescence as should bar the plaintiff's claim." It also appeared in the case, that the owner had given deeds for other lands, recognizing this line as the true line ; it is un-

ALBANY,
Dec. 1836.

Adams
v.
Rockwell.

necessary to say the court refused to disturb it. The next and last is *Dibble* v. *Rogers*, 13 Wendell, 537, which is also now before this court upon a writ of error.

I have been thus purposely minute in travelling through these cases, that it may plainly be seen how infinitely short of any of them is the case under consideration. In every one of them, the line had been fixed and located by positive express agreement, and an actual, visible, notorious possession taken, and continued accordingly with the full knowledge and acquiescence of the parties ; and such possession, too, continued undisturbed and adverse for more than twenty years in every case but three, and those three the cases of *Jackson* v. *Ogden, Jackson* v. *Van Corlear*, and *Jackson* v. *Gardner*, hereafter mentioned, and which, according to my view of the law, were more appropriately the subjects of chancery jurisdiction. It will be observed, also, that in most, if not all the cases cited, the actual and true boundaries between the parties were uncertain or unknown by reason of some ambiguity in the grant, or in consequence of some discrepancy between the survey and the map, or between the survey or map and the deed ; in all such cases the location or settling the line must necessarily be a matter of compromise, either by express agreement, or by possession with the knowledge and acquiescence of the parties, which is tantamount to or evidence of an agreement. Such was the opinion of the court as delivered by Ch. Justice Kent, in *Jackson* v. *Ogden* above cited. He says where the question (of boundary) was rendered ambiguous or uncertain by the contradiction between the map and survey, a practical location and construction given by the parties, and acquiesced in through a series of transfers, and for a great number of years, until the lands have become cultivated and grown into value cannot but operate with great and decisive force. So in *Jackson* v. *Murray*, 7 Johns. R. 5, the court said, " In all cases of any uncertainty, in the location of patents and deeds, courts hold the party to *his actual location.*" And Chief Justice Thompson, in *Jackson* v. *Wood*, 13 Johns. 368, said, " In grants of great antiquity, where the description of the land is vague, and

the construction somewhat doubtful, the acts of the parties, the acts of government, and of those claiming under adjoining patents, are entitled to great weight in the location of a grant." But in the case at bar, there is no uncertainty or vagueness in the description ; there is no ambiguity in the boundaries as given in the deed ; the parties most certainly know where the line is. The description begins at an old known, and well established monument, a place about which there is no controversy or doubt; it is " a stump marked S. D. K. 1810, standing in the first angle north of the south line of the 2000 acre patent; from that monument, in that angle, running south 45 chains 62 links, a definite and precise length of chain, then west," &c., along the true line of Adams. See *Wendell* v. *The People*, 5 Wendell R. 146, and 5 Wendell R. 190. Even if Lee had possessed up to the Rockwell line, from the time of the declarations made by Nathan Durkee and John Gillmore, in the year 1809, and had continued that possession from that time until the commencement of this suit, a period of about 12 years, yet, according to the spirit of the decision in the case of *Jackson* v. *Douglass*, 8 Johns. R. 367, that could not, under the circumstances of this case, preclude the right of Adams. In that case, the only question was as to the boundary line between the lots of the parties, the defendant possessed beyond the true boundary line, and this was the land in question ; but the defendant proved, that where he took possession about *eight* years before the trial, one *of the lessors of the plaintiff showed the line* to which the defendant claimed. The marks of the trees, constituting the true boundary line, were about forty or fifty years old. The court said, " there was no *uncertainty originally* as to the true location of the lots. It is very clear that the defendant possesses beyond the true line, and the single fact, that one of the lessors of the plaintiff, about eight years ago, showed a mistaken line as the true line, is not, of itself, sufficient to conclude him in this case," and judgment was rendered in favor of the plaintiffs. See also *Doe* v. *Thompson*, 5 Cowen, 371–5. But further, in *Jackson* v. *Zimmerman*, 2 Caines' R. 146, the court held, that the plaintiff had

*not* destroyed his title by his own acts, which were his showing a certain line as the division line between himself and the defendant, and erecting a fence thereon; this fence he showed to three witnesses, but to two of them he declared, that, by the will, he ought to have more land; this conduct of the lessor cannot be regarded as a relinquishment of his rights." So in *Stuyvesant* v. *Dunham*, 9 Johns. R. 63, where the division fence between the parties was crooked, and the parties *agreed* that it should be made straight, and the line was run straight by a surveyor employed for that purpose, which excluded some of the land which had been in the possession of the defendant or his ancestors for more than twenty-five years. The plaintiff caused a fence to be made on the straight line pursuant to the agreement, which the defendant caused to be thrown down, which was the trespass complained of. It was proved, that the defendant had said, the line was a straight one. The court said, " To give to à naked parol declaration, that the true line was a straight line, such an effect, after so long an acquiescence in a boundary line, would counteract the beneficial effects of the statute of frauds, and render the title to real property alarmingly insecure. The defendant's possession, for upwards of twenty-five years, was of itself an absolute title and a bar to all the world; he had availed himself of the *locus penitentiæ*," &c. Chief Justice Savage, in *Kip* v. *Norton*, 12 Wendell, 127, said, " It is not pretended in this case, that any express agreement was entered into between the parties; each located for himself under the direction of the agent of their common grantor, who acted under a mistake as to the true location; the plaintiff is not bound, therefore, by any express settlement of the line, and the acquiescence being only for four or five years, is not sufficient evidence of an agreement to conclude him. In that case, the party had erected a store-house, costing $2500, extending beyond his lot to this line, which had been thus acquiesced in for four or five years, and during the building of which no objection was made by the defendant. The shortest period of *possession* and *acquiescence*, which will secure to the possessor

his possession undisturbed, which has come within my ob-
servation, is sixteen years, and that will be found to be set-
tled in the case of *Jackson* v. *Gardner,* 8 Johns. R. 406, and
that was under peculiar circumstances; there the grantee
took immediate possession of the premises granted to him,
and remained in possession for sixteen years, and had
made *valuable improvements.* The court would not per-
mit that possession to be disturbed by the lessee of the
grantor, who claimed a part of the premises, in virtue of a
lease executed before the deed, the lessee having never pos-
sessed the premises covered by the deed. I have been
thus minute in this statement of the cases, to ascertain, if
possible, a certain, definite length of time, where possession
by express agreement shall be adjudged conclusive, or how
long a possession will justify the inference of an agreement,
so as to conclude the parties, and it seems there is no cer-
tain rule upon the subject. Five and eight years have been
adjudged not conclusive; sixteen, eighteen, and nineteen
years have, under particular circumstances, been deemed
long enough to justify a court in determining, that the
possession shall not be disturbed. The cases of eighteen
and nineteen years were cases of possession in pursu-
ance of an express agreement, and that of sixteen years
the continued possession with valuable improvements
made on the premises. It did not require the exercise of any
very extraordinary judgment or sagacity, to lead to the
conclusion, that, according to the decisions of the courts,
Rockwell's pretensions to deprive Adams of land confess-
edly his, could not be sustained without the aid of more
testimony and additional facts than those already produced,
and consequently it was offered, at the circuit, to prove the
location of the 4100 acre patent adjoining this 2000 acre
patent on the south; for it is, upon the location, or pretended
location of the north bounds of the 4100 acre patent, 17
chains 38 links farther north than the true north bounds of that
patent, that this controversy is supposed to have originated.
The Gillmores, losing 17$_4$ chains 38 links in the length of
their north and south line at the southern extremity, insis-
upon the right to retain their length of line, and thus go over

Adams' true line the same distance. It was further offered to be proved in what manner the lots which lie east and west of the *locus in quo*, were located ; to all which Adams made objections, and which, with all due respect, I am compelled to say, were, in my judgment, improperly overruled. Adams' land did not adjoin the northern boundary of the 4100 acre patent. It was not pretended, nor was it shown, that Adams had any knowledge of, or agency in locating the north boundary of that patent ; he had no concern with it whatever, and, therefore, could not be called upon to object or assent to the change of location of that boundary ; he had nothing more to do with it than had the owners of the 7550 acre patent which lies immediately north of the 2000 acre patent ; and it certainly will not be pretended, that if the location of the northern boundary of the 4100 acre patent, which is the southern boundary of the 2000 acre patent, shall be located 17 chains 38 links further north than it ought to be, without the knowledge, approbation and consent of Adams, and he shall be compelled to lose that length of chain from his land, that he would, therefore, have a right to go 17 chains 38 links north of his northern boundary over into the 7550 acre patent; and that the owners of that patent shall be allowed to go 17 chains 28 links farther north of their northern boundary, and so on *ad infinitum*. And why not ? The owners of the 7550 acre patent and the owners north of it have as much to do with the location of the southern boundary of the 2000 acre patent, as has Adams. When was the location of the southern boundary of the 2000 acre patent made ? and who were then the owners of the south part of the 2000 acre patent ? The deed from the commissioners to George Gillmore, conveying to him the whole 2000 acre patent, bears date 30th December, 1785. David Stewart and Gersham Darling say, they have known the beach tree as the reputed corner of the 4100 acres over thirty years, (to wit, before 1789,) and Stewart says, the lots in the 4100 acre patent were laid out and numbered—number one lying immediately south of the beach tree line. George Gillmore then, at the time of the loca-

tion, was the owner not only of the south part, but of the whole of the 2000 acre patent. All the children and heirs of George Gillmore, except John, who owned one-sixth, conveyed on the 5th January, 1800, to Ananias Platt, the 700 acres in which the *locus in quo* is embraced. After this, in September, 1802, James Gillmore received his partition deed from the heirs of George Gillmore, conveying to him the 150 acres immediately south of the 700 acres. It is very evident, then, if any person is to sustain the loss occasioned by the location of the south line 17 chains 38 links north of the true line, it must be James Gillmore, and not Ananias Platt. Adams claims under Platt, and it is expressly admitted in the case, that in all the deeds to and from the several persons from Platt down to Adams, the description of the 700 acres is precisely the same as that contained in the deed to Platt; the parties conveying their undivided interest, a fourth or a sixth, as the case may be. The question therefore of the location of the south line of the 2000 acre patent, is a question exclusively between the owners of the land on the north side of the 4100 acre patent and the owners of the south 300 acres of the 2000 acre patent, and is a question which cannot affect Adams at all. Of necessary consequence, the testimony in relation to the location of this south line is irrevelant as to Adams, is in no manner obligatory upon him, and for that reason should not have been received.

Then as to the overruling the objection made to the admission of evidence relative to the location of the Parish lot, lying northwest, and of the Aldrich and Case lots lying west of the *locus in quo*, I think the circuit judge also erred. It is in testimony in this cause, that an ejectment suit is pending for the recovery of the Aldrich lot. I am not disposed to prejudge that case, nor to settle the rights in relation to the Parish or Case lots. The title to those lots are not now in question before this court. Suppose it be admitted, that Adams was concluded by his acts or declarations from claiming either of those lots, is it to be argued that therefore he is concluded from demanding the *locus in quo?* If a man has seen fit to give away half his farm, shall he therefore be compelled

to give away the other half also ?   I cannot discover the propriety or justice of such a conclusion.   The judgment of the supreme court, sanctioning the decision of the circuit judge in the particulars mentioned, and confirming the verdict of the jury, whereby there has been taken from Adams his land, the title to which is admitted to be in him, should be reversed.

In the examination of this cause I have searched, but in vain, to find a warrant or authority in our courts to repeal or modify positive legislative enactments.   It has been the statute law of this state, since the organization of our government, that no entry upon real estate shall be deemed sufficient or valid as a claim, unless an action be commenced thereupon within one year after the making of such entry, and within 20 years from the time when the right to make such entry descended or accrued.   2 R. S. 293, § 7.   Our courts have been shortening the time, and prohibiting claimants from prosecuting or commencing their actions, to within 19, 18, 16, and in the case now under consideration to 12 years from the time their right accrued.   There is no constitutional provision authorizing judicial legislation—the most unstable and dangerous of all legislation.   It was Lord Camden, I think, who remarked, that the discretion of a good man is often nothing better than caprice, while the discretion of a bad man is an odious and irresponsible tyranny.   The constitution and the statute law are the supreme law of the state, subject only to the constitution and laws of the United States ; and I do not consider myself bound by any decision of any court, which, in my judgment, is in direct violation of the statute.   When, therefore, the statute secures to Adams the right to commence his action for the recovery of his land within 20 years from the time his right accrues, no court has power to say he shall be restricted to commence his suit within 12 years.   I therefore hold the rule to be, at law, that where the boundaries in the deed are clear and unambiguous, and the land thereby described can be easily and without doubt or conjecture ascertained, there no acquiescence or recognition, however unequivocal and often repeated, can have the effect of depriving the

party of his possession or land, unless that acquiescence be continued for at least 20 years; and consequently, that an acquiescence in a location, different from that which the deed gives, is evidence only of the fact that the possession is uninterrupted, and by the assent of the owner of the fee, is adverse to his right. If such possession and acquiescence are suffered to continue for 20 years or more—*not less*—it ripens into a right, and the title of the possessor is as good as if he held by deed; it is, if I may so express it, a statutory deed; for the statute declares that such possession bars all right of entry, and courts of law, in carrying that statute into effect, are bound to protect such possessor in the enjoyment of his possession.

Our statute of limitations is a benign statute; it induces watchfulness and promptitude in the settlement of all claims or demands between our citizens; it fixes a limit to litigation, quiets rights, and shields and protects from the dangers of perjury, and the treachery of the recollection of man. It is a wise and salutary statute; it should be faithfully observed and rigidly enforced, or, out of respect to the administration of justice it should be repealed. Where lands have been located, and such location acquiesced in for any time less than twenty years, either with or without agreement, and during the continuance of such acquiescence, with the knowledge and assent of the party but without objection, buildings are erected and improvements made on the land thus possessed, the owner of the fee nevertheless, at law, will be entitled to recover his land, but the party building or improving is not remediless: full and perfect relief and protection is afforded him in chancery. It is there, where parties are to be protected from the defects or omissions of the statute; that court will never permit or sanction the perpetration of so gross and unconscientious a fraud, but will interpose its equitable power by a perpetual injunction against the owner, from prosecuting at law the person thus induced to build or improve, and upon such terms as shall be deemed equitable and just. *East India Company* v. *Vincent*, 2 Atk. 83. *Niven* v. *Belknap*, 2 Johns. R. 573. *Jacobson* v. *Dominick*, 14 id. 542.

*Wendell* v. *Van Rensselaer*, 1 Johns. Ch. Cas. 354, and the cases there cited.

There is another statute, equally benign, which has been in force in this state since 1787, the salutary provisions of which have been, in a variety of instances, totally disregarded; I mean the statute for the prevention of frauds and perjuries. A truer title was never given to any statute. It is therein provided, that " *no interest in lands,* nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter *be created,* granted, assigned, surrendered or declared, unless by act or operation of law or by *a deed* or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto lawfully authorized." This statute is directly applicable, and should have a controlling influence in the decision of this cause. Rockwell or those under whom he claims, insist they have an *interest in lands,* the legal paper title to which, they admit, is in Adams; and they claim that interest to have been *created* by Adams, by *parol*—nay, not by any parol agreement, but by his silence, and that not for a time long enough to bar his right of entry—and the supreme court have held, that Adams' rights are barred, and his claim to his land is gone, though it *is not* pretended that he has either granted, assigned, surrendered or declared in writing, under his or his authorized agent's hand, any interest in any part of said lands to be in Rockwell or those under whom he claims; while this statute expressly and unequivocally declares, that no interest in lands shall be created, granted or assigned, but by writing. If there was in fact, any location beyond the line, any positive, definite, acknowledged location between the parties, made by Adams or with his assent, the agreement so to locate is void for two reasons: first, because it is not, nor is it pretended to be founded on any consideration; and second, because the agreement is not reduced to writing. There is no difficulty in the parties having their agreement, to change or make a location, reduced to writing. A quit-claim deed, the simplest conveyance known to the law, for the part relinquished or aban

doned, can be drawn in a very few minutes. If the parties really intend to abide by what they say, there can be no objection to have it in writing. But whether inconvenient or objectionable or not to do so, is immaterial; parties must submit to the law, and endure the inconvenience, because it is the law. Every man is presumed to know the law, and he who will not submit to its requirements must abide the consequences. Courts of law cannot make contracts for parties, nor can they enforce any that are not legally made. The statute is designed to promote honest and fair dealing, to put an end to any misunderstanding or misapprehensions as to the terms of any agreement in relation to the transfer of lands, or any interest in them, to protect our citizens from the fraudulent devices of the artful and cunning, and to render all secure in the enjoyment of their possessions, beyond the reach of perjury or the treacherous memory of witnesses. A statute, thus salutary, should be rigidly enforced. Parties complaining of injustice, when they have not complied with those provisions which the law designed for their security, can find fault with no one but themselves when they are told they are without relief; the court can only respond to their application, *ita lex scripta est.* I cannot better express myself on this subject, than was ably done by Mr. Justice Livingston, in *Jackson* v. *Dysling*, 2 Caines, 201, the very first case reported in our books on the subject of location and acquiescence. "The agreement," says he, " to abide by the line to be run in 1789, *being by parol*, was not binding on either; no memoraudum of it was signed by the parties or their agents. It is therefore within the act for the prevention of frauds and perjuries. If the defendant or Klock had removed his fence accordingly, it might have barred him and those claiming under him, as to the extent of his possession, (it would then have been a possession of 40 years;) but not having carried that contract into effect, we cannot enforce a possession in this way, without violating a plain provision of the act. It is an agreement to put the lessor of the plaintiff in possession, which is equivalent to a sale of certain lands then held by Klock, and to which he had a good title, provided they fell according to a line then

to be run in lot No. 12. I can perceive no difference between this condition or proviso and any other which the parties might have thought of. If Klock had promised to remove his fence so many feet, or in other words, to give the lessor so many feet of his land, provided he would pay him a certain sum of money, or do any certain service, it would not have been obligatory, unless it had been in writing. Why then should this agreement be valid? If parties will confide in each other's word, when the law requires a more solemn form of contracting, they cannot complain if courts adhere to the positive directions of an act of the legislature, one object of which is to prevent parol contracts of this kind, or at least to put an end to judicial controversies about them. The court of chancery, with a view of preventing frauds, has gone far, by its decisions, to render this act a dead letter; but we are not sitting in that court, which would probably have done as well, not to depart from the literal provisions of the law, which are too explicit not to be understood, and too salutary not to be strictly enforced. As the defendant then has shown a perfect title to the premises, independent of the agreement of 1789, which not being reduced to writing must be regarded as a nullity. I am of opinion that he must have judgment." These remarks, made 32 years ago, are quite pertinent to the present time, and strikingly appropriate to the present occasion, decisive in my judgment of the case under consideration.

I shall vote for a reversal of the judgment of the supreme court.

On the question being put, *Shall this judgment be reversed?* all the members of the court, with but one dissenting voice, voted in the affirmative; twenty-one members being present.

Whereupon the judgment of the supreme court was accordingly REVERSED.