Van Wyck v. Wright and Johnson.

---

## VAN WYCK *vs.* WRIGHT and JOHNSON.

Where a tract of land is surveyed into sections or lots, by lines actually run and marked upon the land, and one of the sections or lots is subsequently sold and conveyed, and in the conveyance described as bounded upon the adjoining sections or lots, it is not competent to a grantor or those claiming under him, to allege, subsequent to such conveyance, that in the survey of the tract, a *mistake* occurred, by which a larger quantity of land was included in the section sold than was originally intended, and thereby deprive the grantee or those claiming under him; of a portion of the land conveyed; although the mistake is clearly shown, as well by a *map* of the survey made and filed, shortly after the division of the tract, in a public office, as by *parol proof,* exhibited on the trial.

Even had the conveyance of the section sold, referred to the map on file, the *actual survey,* and not *the map,* would have controlled in settling the rights of the parties.

It is a settled rule, that a conveyance is to be construed in reference to its distinct and visible locative calls as marked or appearing upon the land, in preference to quantity, course, distance, map or any thing else.

A deed as to the extent of the premises conveyed, must receive the same construction which would have been given to it immediately after its execution; the subsequent development of facts unknown to the parties at the time of the conveyance, and in reference to which of course they cannot have contracted, cannot affect its construction.

It was competent to the original proprietors, *as between themselves,* to have corrected any mistake which happened in the original survey and subdivision of the tract, but after third [158] persons have acquired rights in conformity to the survey as actually made, the error cannot be corrected to their prejudice without their assent.

Whether in such case the *mistake* be made by a *sub-surveyor* or by the *principal surveyor,* it is equally conclusive upon the proprietors.

An *obliteration of the line* to which the grantee claims, and a correction thereof by an offset, unless within a reasonable distance of the premises conveyed, is not sufficient to charge the purchaser with notice. In this case, the correction of the line was at the distance of six miles from the premises conveyed.

Where the true line between adjoining tracts of land is in dispute, the facts that the owner of one of the tracts directed his agent not to sell any lands within the disputed lines, and omitted to pay taxes imposed upon the lands in dispute, are not such evidence of *acquiescence* as will conclude him from subsequently asserting his right to the land. The doctrine of *acquiescence,* as laid down in *Adams* v. *Rockwell.* 16 *Wendell,* 285, reiterated and confirmed.

ERROR from the supreme court. Van Wyck brought an action of ejectment against Wright and Johnson for the recovery of land in the county of Tompkins, being part of a large tract, called *Watkins and Flint's purchase.* In 1791, one Laurence Vrooman, a surveyor, surveyed the outlines of Watkins and Flint's purchase, under directions from the surveyor-general of the state, and at the same time divided the tract into townships and quarter townships, for the proprietors. The tract was divided into two tiers of townships, there being 12 townships, each township being in width east and west 6¼ miles, and each containing about 40,000 acres. The townships were divided into quarter town ships or sections. Vrooman had three sub-surveyors, who assisted him in run

Van Wyck v. Wright and Johnson.

ning the three interior lines of the tract, running east and west; that is, the line between the north and south tiers of the tract, and the lines dividing the townships into northern and southern portions. Vrooman himself ran the north and south lines dividing the townships from each other, and splitting them up into quarter townships or sections. The townships in the northern tier, commencing on the west side of the tract, are numbered 2, 3, 6, 7, 10,.11. One of the sub-surveyors, named *Sabin*, was directed by Vrooman to run the line east and west through the centre of those townships, and he accordingly commenced on the east side of the tract, and ran a line across townships 11, 10, 7, and half way across township No. 6, making in the whole nearly 22 miles, when he was overtaken by a messenger from Vrooman and informed [159] that his line was from 20 to 24 chains *too far north*, and directed to re- turn and commence anew. Sabin, instead of returning, made an offset, of from 20 to 24 chains to the south, and then continued his line west to the western boundary of the tract. Vrooman made a *map* of the survey of the tract,.and filed it in the surveyor-general's office; on which map, the line east and west through townships 2, 3, 6, 7, 10 and 11, *is a straight and continuous line.* In *July*, 1795, the *southwest quarter* or section of township No. 10, was sub-divided into lots extending north up to the line run by Sabin, and in the same summer the *northwest quarter* or section of the same township was subdivided into lots extending south down to the *Sabin line.* When those subdivisions were made, *Robert C. Johnson,* the common source of title of the parties in this case, was a part owner of both quarters or sections. On the trial of the cause, it was conceded that both parties claimed to hold under Robert C. Johnson, the plaintiff claiming the *southwest* and the defendants the *northwest* quarters or sections of township No. 10. The plaintiff produced in evidence a deed from Robert C. Johnson to John Suydam, bearing date 19th August, 1795, conveying the one equal undivided half part of the *southwest and southeast* quarters of township No. 10, " bounded northerly by the northeast and northwest quarters of said township, east by the southwest quarter of township number eleven, south by the northeast and northwest quarters of township number nine, and west by the southeast quarter of township number seven, situate, lying and being in the twelve townships of Watkins and Flint's purchase, so called, in the county of Tioga, and state of New York, being all the right, title and interest vested in the said Robert C. Johnson to said quarters of township, by force of a deed from James Greenleaf, dated the first day of January last." The consideration expressed in the deed was £4,500, and the deed contained covenants of seizin, quiet enjoyment and warranty. On the 15th June, 1796, Suydam conveyed the same premises to the plaintiff and two other persons. On the 23d December, 1796, a partition was made between the plaintiff and his co-owners, and the owners [160] of the other moiety of the southwest and southeast quarters, whereby the southwest quarter of township number *ten* became vested in the plaintiff and his then co-owner, William B. Verplanck; and in 1807 a partition of the southwest quarter was made between the plaintiff and his co-owner, whereby lot No. 46, (in which the premises in question lie) was allotted to the plaintiff. This was the title shown on the part of the plaintiff.

On the part of the defendants, was produced a deed from John W. Watkins to James Greenleaf, bearing date 30th December, 1794, with a map of Watkins and Flint's purchase attached thereto, conveying, among other tracts, the tract known and distinguished on a certain map or chart now on file in the office of the surveyor-general of the state of New York, by the *southwest quarter of township number ten.* It appeared from the map, that Watkins and Flint's purchase was divided into quarter sections. The southwest section number ten, was represented as 360 chains north and south, 250 chains east and west, and as containing 9,000 acres. The section lines are straight lines, and the north tier of sections in number ten, are larger than the south tier. The northwest section, number

87

ten, contains 11,275 acres. The defendants proved that in 1799, one *James Pumpelly*, in surveying the northern sections of township number seven, discovered *Sabin's line* about 20 or 24 chains north of where it should be, according to the map of Watkins and Flint's purchase. He traced it west to near the west line of the northwest section of number seven; when within about 8 rods of the west line, he found marks of obliteration, such as are usually made by surveyors when a line is obliterated. The corner was obliterated, the blazes were cut out, and the line was obliterated from four to six rods; there were four or five obliterations; east, the line was plain. This witness testified, that from the jog or offset of Sabin, the line *west* was plain; that he *extended Sabin's line as found west, making it one continuous line upon the same course through sections* 7, 10 *and* 11. In the same year, 1799, Pumpelly explained the situation of the [161] lines to *Robert C. Johnson*, who afterwards claimed to his (Pumpelly's) line. In 1806 or 1807, a person of the name of Bush took possession of land down to the Pumpelly line, under title derived from Johnson, one of the defendants, a son of Robert C. Johnson. Van Wyck commenced an ejectment suit against him, which was tried in 1814, and a verdict found for the defendant. Ever since 1806 or 1807, there have been tenants on the disputed tract claiming under Johnson. During the pendency of the suit against Bush, and subsequent to its termination, Van Wyck directed his agent not to sell any lands north of the Pumpelly line, and for several years previous to the trial did not pay taxes on the land between the disputed lines. About the year 1820, *Wright*, one of the defendants, entered into possession of part of lot No. 46, as claimed by the plaintiff, occupying down to the Pumpelly line, and in 1830 this suit was commenced. Johnson, the other defendant, is the landlord of Wright, and was made a party to the suit to enable him to defend. The judge presiding at the trial, charged the jury, among other things, " that if the line run by Pumpelly was a mere continuation of the Sabin line eastward from Sabin's jog or offset, it was the same thing as if it had been run or continued by Sabin himself, and would then be the true line, and control the parties in this suit." The counsel for the plaintiff desired the judge to charge the jury that the *actual marked lines* and *not the map* must control in the decision of the cause, which the judge declined to do. The plaintiff excepted to the charge of the judge as delivered, and also to his refusal to charge as he had been requested. The jury found a verdict for the defendants. The plaintiff applied to the supreme court for a new trial, which was refused, and judgment rendered for the defendants: whereupon the plaintiff removed the record into this court by writ of error.

Previous to the last trial, there had been a trial of the same cause, in which the *plaintiff* had obtained a verdict, which was set aside on the application [162] of the defendant, and a new trial ordered. Upon which occasion, the following opinion was delivered in the supreme court:

" *By the Court,* NELSON, J. Without going into a minute examination of the facts disclosed in this case, it is entirely clear that the line claimed by the plaintiff to be the true east and west line, between the quarter sections of township number ten, was originally run and marked through mistake, and was obliterated and abandoned when the mistake was discovered. It was run when the tract called the purchase of Watkins and Flint was divided into townships and quarter townships, by the surveyor-general of the state; and we should look to that survey, as thus made, in determining its accuracy or effects, especially if we lay out of view settlements and location. Now, looking at this survey, it is obvious that any intelligent man or purchaser examining it, would see the error in the line, and that it had been abandoned. The testimony of Mr. Pumpelly is conclusive, on this point. But it is said that the line is clear and perfect through the sections of lot number ten, and that the purchasers of these sections are bound by it, though as a line dividing east and west this tier of townships on the tract, and for which purpose it was run—it was also abandoned; and though it would be obvi-

Van Wyck v. Wright and Johnson.

ous to any one who would explore it, that as such line it was abandoned. This I cannot admit. If the plaintiff seeks to support his claim to the land in question by virtue of this line, and it alone, he must sustain it as a part of the line originally run in dividing the sections in the townships on the tract. It was to run this line, among others, that authority was given by the surveyor-general, and which gives to the line its force and effect, all other considerations out of question. The naked fact that a marked line could be traced through the woods, *per se*, amounted to nothing, unless connected with some authority to run and mark it. Any trespasser could make one. Upon this view of the case, then, I can perceive nothing in the line claimed by the plaintiff, which concludes the defendant from running one between the north and south sections of this township according to the map and field-book ; the obliteration and abandonment of it, left this part of the tract as [163] if none had been run, and in such a case there can be no doubt that either party had a right to extend the true Sabin line, from where it commenced, between six and seven, to the east line of the tract. This view does not conflict with any of the cases on this subject, cited by the counsel for the plaintiff, but is consistent with all of them. It seems to me that if the line in question had been run by a trespasser, or any other person without right, that the plaintiff, with the same show of reason and argument, might claim it as binding upon the owners of the township. Why should it be viewed of greater force or effect, when it was abandoned in fact as erroneous, by the only person who had authority to run it, and the evidence of such abandonment left palpable to any one exploring on the ground, and where too the map and field-book indicated the true line.

" It was not understood or believed at the trial of *Jackson* v. *Johnson*, (4 *Cowen*, 450,) that this line of itself was conclusive upon the parties, nor is any such opinion intimated or expressed by the chief justice at bar. The case at the circuit and bar was put upon a principle wholly distinct and independent of the correctness or effect of the line. It was decided upon the ground frequently considered and approved by this court, that where the marked line has been erroneously run, and the one on the map and in the field-book is correct, and there has been an actual location and possession for years, according to the ground line, acquiesced in by the adjoining owners, the latter shall not be permitted even to correct the line, and thereby break up such possession and deprive the party of his improvements ; and this principle, aside from any other, is conclusive against the plaintiff ; for if a location and possession acquiesced in for years, upon an erroneous line of marked trees, will prevail over the true one given by the map and field-book, can it be pretended that a like location, possession and acquiescence, according to the true line given by the map and field-book, will not prevail over an erroneous ground line ? The proof of the possession, according to the Pumpelly line, which is the extension of the true Sabin line under the defendant, Johnson, and his ancestors, is full, and that it has been continued [164] and unbroken since the first settlement of the section, which was in 1805. The defendant, Wright, has been in possession upwards of twelve years, according to this line. The plaintiff, in 1807, brought an ejectment against Johnson, which was tried in 1814, and the decision was against him. During all this time, he sold to purchasers only up to the line claimed by Johnson, and after the result of the suit, paid no taxes beyond that line. The application of the same principle, upon which the plaintiff recovered in *Jackson* v. *Johnson*, defeats the plaintiff in this cause. New trial granted, costs to abide the event."

On the cause coming again before the court, the following opinion was delivered :

" *By the Court*, NELSON, Ch. J. The principles governing this case were explained when before us on a former trial. As the facts disclose no material variation, the Pumpelly line is the true one ; Sabin's was erroneous, and had been abandoned. The corrected line had not been run upon the ground, but the

Van Wyck v. Wright and Johnson.

survey bill and map were right; and no legal objection existed to the establishment of a true ground line accordingly, which was done by Pumpelly."

Besides the question arising upon the charge of the circuit judge, there were other questions raised by the plaintiff, and presented by the bill of exceptions; but as they were not sustained by the court, and are of minor importance, they are not noticed in this report of the case.

The cause was argued in this court by

*J. L. Wendell & S. Beardsley*, (attorney-general,) for the plaintiff.

*J. A. Collier*, for the defendants.

The following opinion was delivered by the CHANCELLOR:

[165]    By the CHANCELLOR. The only important question in this case is, whether the deed from Johnson to Suydam conveyed the southwest quarter of township number ten, as the same was actually run and marked upon the land at the time of that conveyance, or only conveyed as it would have been run if Sabin had run the line back from where he made the offset, six miles and a quarter west of this section.

The deed from Johnson to Suydam is for an undivided moiety of the S. W. and S. E. quarters of township No. 10, " bounded northerly by the N. E. and N. W. quarters of the said township, east by the southwest quarter of No. 11, south by the N. E. and N. W. quarters of township No. 9, and west by the S. E. quarter of township N. 7, being all the right vested in Johnson to those quarters by a deed from J. Greenleaf, dated the first of January then last," with covenants of warranty and seizin. No reference whatever is made in this deed to any map, or other descriptive or locative calls, to enable the grantee to ascertain and locate the premises granted, or to determine the length of any of the lines or the number of acres intended to be conveyed. The deed referred to, from Greenleaf, is not given in evidence. But if it had been, and had contained direct reference to a map on file, it could not have altered the legal construction of the deed to Suydam in this respect, as it is not referred to therein as containing a description of the premises intended to be conveyed. It is merely referred to as showing the extent of the right or interest in these two quarter sections conveyed to Johnson by the deed of Greenleaf. What then would be the first legal resort of the grantee, and those claiming under him, to ascertain and locate the premises thus granted? Certainly it was to ascertain whether the two quarter sections granted were actually run out and marked, or located upon the land at the time of the conveyance, bounded in the manner described in the deed. And certainly there can be no doubt whatever, that if the purchaser had gone to the land at the time he took the conveyance, or before, and such is the legal presumption as to [166] the locative calls in the deed, he would have found every quarter or section adjoining the two conveyed to him actually located upon the land, and those which were described as bounding him on the north, the east and the west, he would have found with their corners distinctly marked upon the Sabin line. It is true, if he had been furnished with a copy of the map returned to the surveyor-general's office by Vrooman, he would have seen that the line running east and west, upon the north end of his two quarter sections, should be a straight line through the whole six townships—a distance of about 35 miles; but he could not, by a mere inspection of the map, know that the line upon which his two sections, and those east, west and north of them were cornered and marked, was not a continuation of the same line which ran through townships 2, 3 and 6 farther west. It would have been necessary for him to travel six miles and a quarter from the lands granted to him, to have found the obliterated corner upon the north line of township No. 6, even if he had had an intimation that there was a mistake in the location of the line and boundaries and corners of the lots conveyed to him. Such a constructive notice of a mistake in the location of the lines of a lot, would be a very unreasonable one to enforce against the settlers upon lands in a new country. Very few persons would be willing to purchase

Van Wyck. v. Wright and Johnson.

if they were exposed to lose the best part of their farms, or indeed any part thereof, upon such a rule of construction. I apprehend, then, that the circuit judge entirely mistook the law, when he told the jury that if the Pumpelly line was a continuation of the Sabin line eastward from where the offset was made, it was the same thing as if it had been run or continued by Sabin himself, and must control the parties in this suit.

There is no doubt that the original proprietors of the Watkins and Flint purchase, for whom Vrooman was employed to subdivide the tract, might have corrected this line before any third person had acquired rights under conveyances from them or the patentee; and so they might also have corrected Vrooman's own line between the two sections conveyed to Suydam, which it appears by the testimony from Byles' field-book, was run about fourteen chains too [167] far west. But after third persons had acquired rights under conveyances which, upon their legal construction, had reference to the line as actually run upon the land at the time of such conveyances, it was too late for any one to correct the lines, to their injury, without their consent.

It can make no difference in this case that the erroneous line was run by a sub-surveyor, and that he was directed to correct it. Vrooman, it is true, was the principal agent of the proprietors to subdivide the tract into townships and quarters, at the same time that he run the outer bounds of the whole tract as the agent of the state. But the proprietors could not have expected him to run 300 miles of these division lines, in addition to the out bounds of the tract, without the assistance of sub-surveyors. The agents employed by him for this purpose, therefore, were the agents of the proprietors as to the lines run by them respectively; and if any of these agents erroneously located the lines and corners of sections and townships on the land, and left them there without correction, innocent bona fide purchasers are not to lose their land which has been conveyed with reference to such lines and corners, upon parol proof forty years afterwards, that such agents were directed to make corrections.

The question here is not, what the grantor or grantee in the deed to Suydam may have understood, independent of the description in the conveyance itself; but what would a person who had read this conveyance and then attempted to locate the land, immediately after the execution thereof, have understood it to mean, as the rights of subsequent purchasers are now concerned. It is not material, therefore, whether Suydam ever saw the map or not, as it is not referred to in the deed to him. Again: this quarter, or section, had been actually subdivided into lots bounding upon the Sabin line, before the conveyance to Suydam. And Smith and Denton afterwards conveyed the other undivided half of this section to the plaintiff, or those under whom he claims title, with express reference to the section as thus subdivided to the Sabin line by Byles.

I consider the law so well settled that a conveyance is to be construed [168] in reference to its distinct and visible locative calls as marked or appearing upon the land, in preference to quantity, course, distance, map, or any thing else, that it would be waste of time to refer to the numerous authorities on the subject. In the case of *Jackson* v. *Hunter*, (1 *Johns. R.* 495,) the supreme court of this state, at an early day, attempted to control the actual location of a lot, which had been erroneously located on the land, by the map which was particularly referred to in the patent. But they subsequently found that such a construction of conveyances would inevitably produce confusion of titles and interminable litigation; and that case was therefore overruled in *Jackson* v. *Cole*, (16 *Johns. R.* 257.) Again, in *Jackson* v. *Freer*, (17 *id.* 29,) the same question was raised, and the correct doctrine on this subject was sustained, which has ever since been followed in this state until the present case.

The question as to acquiescence does not arise here, as the decision of the judge, that if the Pumpelly line was a continuation of the Sabin line from the

offset, it was the line which must govern the parties, took that question from the jury.   Upon the principles established by this court in the recent case of *Adams* v. *Rockwell,* (16 *Wendell,* 285,) however, the plaintiff has not lost his right by any acquiescence in the Pumpelly line.   If there was a dispute as to the land lying between the two lines, he did right to direct his agent not to sell it until the question of right should be finally disposed of, by compromise or otherwise. And a refusal to pay the taxes was no abandonment of his right; as he might have refused to pay them so as to be enabled to bid in the land at the comptroller's sale, and to put an end to the dispute in that way.

I therefore think the decision of the supreme court in this case was erroneous, and should be reversed.

*Senator* DICKINSON delivered an opinion in favor of an *affirmance* of the judgment of the supreme court, on the ground that, under the circumstances of the [169] case, the plaintiff should be considered as having *acquiesced* in Pumpelly's line.   As the opinion consisted principally of a review of the *evidence* in the case, it is not published.

On the question being put, *Shall this judgment be reversed?* the members of the court divided as follows:

*In the affirmative:* The PRESIDENT of the Senate, the CHANCELLOR, and *Senators* BECKWITH, DOWNING, JOHNSON, LACY, LOOMIS, MACK, MAISON, SPRAKER, TRACY, WAGER, WILLES.—13.

*In the negative:* Senators DICKINSON, HUNTINGTON, LAWYER, McLEAN, TALLMADGE, VAN DYCK.—6.

Whereupon the judgment of the supreme court was REVERSED, and a *venire de novo* awarded.

Judgment reversed.