### SMITH *vs.* McALLISTER.

An acquiescence by proprietors of adjoining lands, in an actual location of a boundary line, for a length of time sufficient to bar an entry, is evidence from which the law will presume the existence of an agreement to abide by such location.

Where an owner of land built a stone fence on what was supposed to be the boundary line between his land and that of an adjoining proprietor, the latter being present at the time, and seeing the fence placed where it was, without objection or remark; and he, and those claiming under him, suffered the person building the fence, and his grantees, to cultivate and appropriate the land, up to the wall, under a claim of title, for thirty-five years without interruption or question; *Held*, that although the fence was erroneously located, so as to include a strip of land belonging to the adjoining proprietor, ejectment would not lie.

Where a deed of lands describes the subject matter by monuments clearly identified, such as a river, a tree, or other natural object, and the courses, distances and quantity are likewise inserted, which disagree with the monuments, the description by monuments will in general prevail.

THE facts in this case are stated in the opinion of the court.

*T. McKissock*, for the plaintiff.

*E. A. Brewster*, for the defendant.

BROWN, J.  This is an action of ejectment for land in the village of Newburgh, and its object is to settle a disputed boundary line.  The value of the property in controversy is small, but the questions involved are of sufficient consequence to demand something more than a mere decision.  The plaintiff and the defendant are the owners of adjoining lands, the plaintiff on

the south and the defendant on the north, upon a line running nearly east and west, and known as the south line of the Glebe lands. The occupations are separated by a stone wall erected between the years 1812 and 1817. The plaintiff and those under whom he claims have held and cultivated up to the south side of the wall for 25 years at least, and the defendant, and those under whom he claims, have in like manner held and cultivated up to the north side of the wall for the space of 35 years. The plaintiff's title is derived from William L. Smith, who was in possession as owner in the year 1812. From him the title passed to Maria Smith, and by her executors was conveyed to the plaintiff by deed bearing date March 1st, 1850. The paper titles of both parties cover the lands up to the Glebe line, and the testimony of the surveyor, Stephen Parmenter, places it beyond a doubt that the stone wall is nineteen links upon the west end and ten links upon the east end south of the true line of the Glebe. The question is one of adverse possession exclusively, and it becomes necessary to examine the proof with a view to ascertain whether the defendant can maintain his defense upon that ground alone.

Among the papers in the cause there is a stipulation by which it is admitted "that the south line of the Glebe is the north line of the lands claimed by the plaintiff; that there is a stone fence on the south line of the lands claimed by the defendant, which is the only fence between the lands of the plaintiff and defendant; that the plaintiff, or those under whom he claims, have not been in possession of the land claimed by him, for 25 years; that the stone fence has been where it now is for over 25 years, and that the land in dispute has for over 25 years been included within the defendant's enclosure, and occupied and used by him, and those under whom he claims, and tilled and cultivated in common with their other lands; and that the plaintiff, and those under whom he claims, have for more than 25 years used and cultivated the land south of and up to the stone fence." To give character to the fence and the possession of the defendant, Pedro Leon was examined as a witness for the defendant, and testified, "that he had known the property occu-

pied by the defendant, since 1812; and knew the stone fence running along the south side of the lot. It was put up between the years 1812 and 1817. He lived with Levi Dodge, who owned the McAllister lot at that time, and William L. Smith occupied the plaintiff's lot, which was then in woods. Dodge made the stone fence. There was a rail fence on the line at that time, and the McAllister lot was under cultivation. The stone fence was intended for a line fence. Dodge and William L. Smith met up there together. Dodge wanted Smith to continue his part of the fence, which Smith declined to make, saying it was nothing but woods, and he could not afford to make a stone fence, but would take his time to build it. Dodge wanted Smith to build easterly from where we built, and we were then drawing stone for our part of the fence. The fence has been in the same place ever since, and the McAllister lot has always been cultivated up to the fence. The witness also said that Dodge left the McAllister lot, with other lands adjoining easterly, to his heirs, who sold to John Farnum. He conveyed to Selah Reeve, whose executors sold to Joseph Chase, from whom the defendant McAllister obtained his title. All these persons occupied up to the stone fence, considered it the line, and worked up to it."

The facts conceded by the stipulation, and established by this witness, furnish all the essential elements of an adverse possession. There is an acquiescence in an erroneous location, for a period of time sufficient to bar an entry. There is an occupation marked by a substantial stone wall, which all the occupants of the McAllister lot regarded and claimed to be the line. It was a possession known and notorious, and abundantly sufficient to apprise William L. Smith, and those who came after him, that the owners of the McAllister lot claimed title to the lands north of the stone wall. The rule which must prevail in cases of this kind stands upon the plainest principles of reason and public policy. If controversies in regard to disputed boundary lines could be revived and renewed after the lapse of so many years, there would be neither peace nor repose, nor security for private rights. No man could know when litigation was to

Smith *v.* McAllister.

cease, or upon what title he might rest for the safety of his estate. The right of proprietors of adjoining lands to adjust and ascertain a disputed line by express agreement, so as to bind all who come after them, cannot be disputed. And an acquiescence in an actual location, for a length of time sufficient to bar an entry, is evidence from which the law will presume the existence of an agreement to abide by such location. "Cases," says Chief Justice Savage, in *McCormick* v. *Barnum*, (10 *Wend.* 104,) "of this description have been frequently before the court. The principle upon which they have all been decided, is, that where parties agree upon a division line, either expressly or by long acquiescence, such line shall not be disturbed; buildings and permanent improvements may be made upon the faith of the location of the line; transfers may be made; and to permit such line to be altered, might be productive of incalculable injury." In *Kip* v. *Norton*, (12 *Wend.* 127,) the rule is reasserted by the same judge in the following terms. "Such an assent to a location must be either express or implied. If there is a disputed line between two adjoining proprietors of land, it may be settled between them by a location made by both, or made by one and acquiesced in by the other, for so long a time as to be evidence of an agreement to the line. There can be no doubt that an express parol agreement to settle a disputed or unsettled line is valid, if executed immediately and possession accompanies and follows the agreement. So when there has been no express agreement, long acquiescence by one in the line assumed by the other, is evidence of an agreement." In the much litigated case of *Rockwell* v. *Adams*, decided in the court of errors, (16 *Wend.* 285,) the same rule is reaffirmed, and it was there held, "That to establish a practical location different from the certain and known boundaries described in the deed, which shall deprive the party claiming under the deed of his legal rights, there must either be a location which has been acquiesced in for a sufficient length of time to bar a right of entry under the statute of limitations in relation to real estate; or the erroneous line must have been agreed upon between the parties claiming the land on both sides thereof; or the party

whose rights are to be thus barred, must have silently looked on and seen the other party doing acts, or subjecting himself to expenses in relation to the land on the opposite side of the line, which would be an injury to him, and which he would not have done if the line had not been so located." The conversation spoken of by Pedro Leon, between Smith and Dodge, between 1812 and 1817, has not the effect of an agreement to establish the line at the place where the fence was put, but taken in connection with the subsequent conduct of Smith and those who derive title from him, it proves an acquiescence in the location then made, within the principle of the cases cited. Smith was present and saw Dodge place the line fence where it now stands, without objection or remark. He and those claiming under him have suffered Dodge and his grantees to cultivate and appropriate the land to their own use, under a claim of title, close up to the north side of the wall, for 35 years, without interruption or question. And in the absence of other controlling circumstances, to suffer the plaintiff to recover in the present action, would be in effect to repeal the statute of limitations by judicial construction, and to reopen a dispute which should be forever closed.

The counsel for the plaintiff, however, insists that there is a fact apparent upon the face of the papers, which estops the defendant from asserting his adverse possession, and deprives him of the benefit of the statute of limitations. This is to be found in the language of the deed from Joseph Chase to the defendant, McAllister, of the date of March 31st, 1840. The defendant is a party to this instrument, must be presumed to know its contents, and is bound by them, to whatever extent they may affect his interests. The argument is that the defendant therein admits that the lands in dispute were the lands of Maria Smith, at the time the conveyance was executed, and he is therefore estopped and precluded from gainsaying that admission. It is said to be found in the description of the premises. It begins " on the south side of the road leading from the Baptist church to Limestone Hill, on the east side of the lane of John Greenfield, and running thence along the east side of said lane south

37 degrees west 8 chains and 13 links to lands of Maria Smith;
thence along her lands south 79 degrees east 5 chains to a large
chesnut stump; thence" two other courses not material to the
present inquiry, to the place of beginning. The proof is that
the line run upon the two first courses, and for the distances
given, corresponds precisely with the line claimed by the plain-
tiff; and as they terminate, according to the deed, at the lands of
Maria Smith, this is supposed to be an admission that the lands
of Maria Smith commence where the first course terminates.
This point presents the real question in controversy, to wit,
whether the monuments or the courses and distances shall control.
The courses and distances will not, according to the testimony
of the surveyor, reach the wall, but will fall short of it 19 links
upon the west side, and 10 links on the east side of the lot.
The first course runs from the place of beginning south 37 de-
grees west 8 chains 13 links to the lands of Maria Smith, and
the second is along the lands of Maria Smith, south 79 degrees
east to a large chesnut stump. The surveyor found a large
stump in the line claimed by the plaintiff at the end of the sec-
ond course, and saw no other stump in the vicinity. Still both
courses make the lands of Maria Smith the southern boundary
of McAllister's land; and we are thus brought to consider what
were the lands of Maria Smith, on the 31st of March, 1840, and
what did Chase and McAllister intend when they used the
words "lands of Maria Smith." The books do not leave this
inquiry to conjecture and uncertainty. "The American cases
abound with illustrations in respect to the doctrine of inaccurate
description of lands. In the application of the doctrine to in-
stances where a subject matter is found which may satisfy
either part of a repugnant or contrary description—but not the
whole—that part of the description which according to settled
principles of construction, is presumed to express with most
certainty the intention of the parties, shall prevail over others
of less importance. Accordingly, where a deed of lands describes
the subject matter by monuments clearly identified, such as a
river, a spring, a stream, a mountain, a marked tree or other nat-
ural object, and the courses, distances and quantity are likewise

inserted, which disagree with the monuments, the description by monuments shall in general prevail. For it is more likely that a party purchasing or selling land should make mistakes in respect to courses, distances and quantity, than in respect to visible objects, which latter from being mentioned are presumed to have been examined at the time." " The monuments which shall control course, distance, &c. under such circumstances, may be any objects which are visible, fixed, and clearly ascertained as the lands of other individuals, or their corners." (*Cowen & Hill's Notes*, 1378, 1379, *where a number of cases are cited in support of the rule.*) The lands of Maria Smith, at the time McAllister took his deed, were those south of the center of the stone wall erected by Dodge. All north of that line had passed to the owners of McAllister's lot, by force of the statute of limitations, as effectually as they would have passed by an absolute grant. If literal effect is given to the words "lands of Maria Smith," the south bounds of McAllister's lot reach to the center of the wall. If we look for the intention of the parties in the language they have employed, we inevitably arrive at the same result. The "lands of Maria Smith" were defined on the north by a visible and known boundary. The lines of adjoining proprietors are seldom marked out by monuments more notorious and durable, than a stone wall which has stood unmoved upon its foundations for the third of a century. Chase owned, occupied and cultivated up to the wall, and had he designed to except from the operation of his grant a narrow strip of land, from 10 to 19 links wide, of no manner of use and to which he could have no access, he would have used some words to indicate his purpose. But by giving the lands of Maria Smith as the end of the first course, and the same lands as the line of the second course, his intention to convey all north of Maria Smith's north boundary, as it was then established and recognized, is too clear to admit of a doubt. Even if the deed from Chase to McAllister was open to the plaintiff's construction, I am not able to perceive how it could aid him to shift the line and recover the land. He must prevail upon the strength of his own title, and not upon the want or weakness of title in his adversary. Without

showing title in himself he must fail; and if those under whom he claims became divested of their title before the 31st March, 1840, by operation of law, no misdescription of the premises in the deed from Chase to McAllister could re-invest it. There is nothing short of an instrument in writing sufficient to pass real property, or an adverse possession sufficient to bar an entry which could give them title to that to which they had no title. (*Stuyvesant* v. *Dunham,* 9 *John.* 61.   *Davis* v. *Townsend,* 10 *Barb.* 333.)

I have chosen to put the decision upon grounds which I think must effectually preclude all persons claiming under William L. Smith from disturbing this line, rather than upon the ground that the plaintiff's deed is void in respect to the lands claimed, by reason of the defendant's adverse possession at the time it was executed.

Judgment is therefore given for the defendant.

[ORANGE SPECIAL TERM, November 8, 1852.   *Brown,* Justice.]