[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 281 
This action was originally instituted by Elizabeth A. Ridgely, who has since intermarried with William H. Hunt, and subsequent to their marriage it has been continued by consent in the names of the husband and wife. It was for cutting down and carrying away several hemlock trees and other timber, on subdivision forty-seven, in the middle allotment of Great lot number four, of the Hardenburgh patent, in the town of Neversink, in the county of Sullivan, of which it is alleged Miss Ridgely (now Mrs. Hunt) was seised in fee simple. The defendants deny that she was the owner of the lot in question, or that it was a part of the Hardenburgh patent, and claim that it was included in the patent of the town of Rochester, and was owned by Neal Benson, and allege that if the imputed acts were perpetrated by them it was under a license from him.
The defendants contended on the trial, that as the action was for a trespass alleged to have been committed on the separate property of the wife, it could not be maintained in the joint names of the husband and wife. The objection was overruled, and I think properly. At common law the rule was that the *Page 282 
husband and wife should join in an action for a wrong perpetrated against her previous to their marriage, although the right to pursue it might remain to her in the event of his death. The Code provides that when a married woman is a party, her husband must be joined with her, except that when the action concerns her separate property, she may sue alone. It is unnecessary to consider whether a right of action for a tort, existing in the wife at the time of her marriage, may be deemed property, as I think that the provision in the Code was designed to enable her to maintain a suit under certain circumstances, in her own name, and not to abrogate the privilege of associating her husband with her in the litigation, at their joint option. An enabling statute should not be construed to take away a previously existing privilege, unless it is clearly repugnant to the newly conferred right. If, however, the union of the two had been objectionable, the defendants should have demurred. Having omitted to do that, and having indeed consented to the addition of the husband, it was too late to raise the objection on the trial. All that they could have claimed then would have been that a recovery, if any, should have been by the wife alone; but they did not ask for that.
The two important questions upon the trial were, first: was the lot in which the wood was cut in the Hardenburgh patent; and second: if it was, did the plaintiff sufficiently prove a regular chain of title from the original patentees down to Mrs. Hunt. The Hardenburgh patent lies west of the Rochester patent. The boundary line between them is defined in the patent to the town of Rochester, which is dated on the 25th of June, 1703. It commences at a point in the northwest bounds of the lands of Captain Evans, against the Sand hills, and runs from thence with a northwest course to the great mountains, commonly called the Blue hills, and thence northwest something northerly, along the said hills to the bounds of Marbletown. The Hardenburgh patent is dated April 20, 1708, and the patented premises are bounded, where they adjoin the town of Rochester, in general terms, by "the bounds *Page 283 
of Rochester." So far as relates to the calls of the patents in reference to their common boundary line, the description in the patent, when sufficiently definite and the application clear, is the appropriate guide. The other boundary lines in the two patents are too indefinite to throw any light upon the question as to the true location of the one common to both. It would seem, from the evidence, that there were, at an early date, considerable difficulties and disputes in locating that line. There were, in that region of the country, two (and probably more) sand hills, and, as I think, two ranges of great mountains called the Blue hills, and so situated that either might be claimed as those mentioned in the patent to Rochester without doing violence to its language. The Hardenburgh patentees contended that the sand hill which formed the starting point to indicate the line, was at a place called Napanoc, and the Blue hills were some five miles east of the Neversink river, and in the neighborhood of a line since run by Cockburn and Wygram, and called their line. If they were right, the land claimed by the plaintiff is in the Hardenburgh patent. The defendants contend, and probably it was so supposed by the Rochester patentees, that the sand hill referred to was upon the line between the counties of Ulster and Sullivan, and the Blue hills are in a range of mountains east of the village of Liberty, which are about a mile west of the Neversink river. If the defendants are right in their location, then the premises in dispute are included in the Rochester patent. The tract between the two lines contains about eighty thousand acres. It does not appear from the evidence which of the two sand hills is against the westerly bounds of what was, at the time, the land of Captain Evans, nor which of the ranges of Blue hills (if there were two such) constituted or adjoined the bounds of Marbletown. The ambiguities created by the duplications of the sand hills and the Blue mountains, or, if there is but one range of Blue mountains, their uncertain locality, are latent and, of course, susceptible of extrinsic explanation. Where, as in this instance, the question as to a boundary line relates to a large region, and especially to one *Page 284 
so extensive as to make it a matter of public notoriety, the early acts of the different patentees, and of the various persons claiming under them, ancient written documents, and especially such as have been retained by different owners as muniments of title, and the declarations of deceased persons who may be supposed to have knowledge on the subject, if made ante litemmotam, are competent evidence. So, too, if the parties interested agree upon a line at an early date, and adhere to it for many years, that raises a strong presumption of the correctness of its location, and is evidence for that purpose, even where the parties are not conclusively bound by such acts. These are familiar rules of evidence, and it is not necessary to cite any authorities to sustain them.
The plaintiffs offered in evidence an agreement between the trustees of Rochester and certain proprietors of lands in the Hardenburgh patent, under one of whom the plaintiffs claim the lot in question, dated on the 21st June, 1776, that a line should be run, and monuments erected, and that the owners of the town of Rochester, and the owners of the Hardenburgh patent, as many as could be found, should release to each other, at a joint expense. The subscribing witness had testified before a county judge that the parties had acknowledged to him that they had signed the paper, and that he had subscribed the same as a witness; and a certificate was indorsed to that effect. The proof of the execution of the paper was undoubtedly imperfect. But it was referred to, in a manner sufficient to identify and authenticate it, in what was called a settlement deed executed by the trustees of Rochester and others, dated the 13th of February, 1778, the execution of which was duly proved, as will be hereafter stated, and it was found in 1809 among the muniments of title preserved by Colonel Hunter, who held lands, under one of the parties, claimed to be in the Hardenburgh patent.
It was proved by the town records of Rochester that three of the persons whose names were subscribed to the agreement were the trustees of the town, at its date. The writing was, I think, under the circumstances, competent evidence, especially *Page 285 
on the question of boundary. All that it was designed to prove by it was, that the line subsequently run in the same year was by the consent of those legally representing the town of Rochester. It was not, however, strictly necessary for that purpose, as the same fact was acknowledged in the subsequent settlement deed, which was duly executed, and the execution of which was proved.
The plaintiffs produced in evidence field notes of the lines run for the boundary between Rochester and the Hardenburgh patent in 1776, pursuant to the before mentioned agreement. The notes were procured from the town records of Rochester, which was sufficient to authenticate the paper. The fact that it had been preserved among the records of the town was sufficient to prove its genuineness, at any rate as against persons claiming under the patent to that town by conveyances of a subsequent date.
The plaintiffs offered in evidence an instrument found among the records and papers of the town of Rochester by the town clerk, and which he testified was one of the records of the town, known as the settlement-deed between the trustees of Rochester and certain of the Hardenburgh proprietors, including the three proprietors of the lot now claimed through them by the plaintiffs. The deed was dated on the 13th of February, 1778. It purported to be between the three trustees and three freeholders of the town of Rochester, "of the one part," and Colonel Johannis Hardenberg, Robert R. Livingston, and Samuel Verplanck, of the other part. It was executed by all the parties named, except Colonel Jacob Hornbeck, named as one of the trustees. As to him, the plaintiffs offered to prove that he died a short time before the deed was executed. The defendants objected to the proposed evidence, on the ground that the parties were estopped from denying that he was an existing trustee by his being named as such in the deed. Possibly, if Colonel Hornbeck had been living, the parties might have been precluded from denying his official character; but I know of no rule which would prevent a party claiming under a deed nominally from them, but executed by two of them *Page 286 
only, from proving that the other was dead. That would be extending the doctrine of estoppel, and without any good reason. The proof offered to show that Colonel Hornbeck was dead when the deed was executed, was, in my opinion, competent, and sufficient to establish that fact. It was shown that he had but one child, who died young and without issue. A family Bible of his brother, Lodowick Hornbeck, was produced by Philip Hornbeck, one of his descendants, who was born in 1797, and had known it from his earliest recollection. In that is the following entry: "1778, January 10th, then is Jacob Hornbeck deceased." It was decided that this evidence was inadmissible. I must confess, I cannot see upon what ground. In questions of pedigree, the verbal declarations of the members of the family are competent evidence. The entries in a family Bible are much more reliable. The rule extends to the times of the births, marriages and deaths of the ancestors or other near relations. The Bible, if it had been admitted, would have shown that Jacob Hornbeck died in the month preceding the date of the deed; and that so brief a time had intervened, was probably the reason why his name was inserted in the deed.
It was objected that it was not proved that the three persons named in the deed as trustees had been elected to the office, or that the three persons named as freeholders of the town were such. As to the trustees, it was proved by the town records that they had been elected in the preceding June. The patent provides that the trustees may dispose of the lands of the town by and with the advice of two of the principal freeholders. Probably such freeholders were not elected by the inhabitants, but selected from time to time by the trustees. In most instances it would be difficult, in many it would be impossible, to prove by positive testimony that persons described as freeholders were such at a remote date. Their association with the trustees in a deed executed by them, and the fact that the deed had been filed and retained among the town records, are sufficient evidence that they were truly described. As the deed was executed by the only then existing *Page 287 
trustees and the required freeholders, it was clearly valid, if the trustees and freeholders were empowered by the patent to execute a paper for the purposes therein specified. The legal estate was unquestionably in the trustees. It has been so decided in several cases in the Supreme Court, in which the patent in question has been considered. (2 John. R., 230; 9 id., 73; 12id., 199.) The power of disposition was unrestricted and absolute, and authorized the trustees and freeholders to sell and convey any part of the patented premises. The deed in question was not, however, designed as a sale or conveyance of any land. It was to fix the boundary line, and thus determine the extent of the patented lands. That is a power clearly belonging to the trustees of every patented town in whom the legal title is vested. It is an incident to the legal estate and power of disposition. It has been repeatedly and extensively exercised by the trustees of such towns; and if we should decide that their settlements of boundary lines were invalid, we should seriously prejudice, if not destroy, many estates in lands which have been fairly acquired, long enjoyed, and extensively improved. The objection to the proof of the execution of this deed before the county judge was invalid, for the reason which I shall consider hereafter in speaking of other deeds. This deed referred to the agreement to run the line, stated the fact that the line had been run, particularly described it, and contained a stipulation that it should be held forever thereafter as the true bounds of the town of Rochester, only with respect to the parties of the second part, their heirs and assigns. I have already referred to the fact, that two of such parties were the existing proprietors of the land now claimed by the plaintiffs. There was, then, an agreement to run a division line; the line was actually run; and then there was a solemn contract, under seal, that it should be the actual boundary between the parties. It seems to me that the parties were then bound to adhere to the line which could not be subsequently controverted by them, or any one claiming under them by subsequent grants. As, however, some of the evidence offered to prove the death of one of the trustees previous *Page 288 
to the execution of the settlement deed was rejected, and the evidence upon that subject which was received was deemed insufficient, the judge, at the request of the counsel for the defendants, charged the jury that the deed was invalid, and vested no title in the proprietors of the Hardenburgh patent. In deciding that the deed was invalid, he must have meant that it did not, under the circumstances, absolutely conclude the proprietors under the Hardenburgh patent. It is apparent, from other portions of his charge, that he considered it as competent evidence on the question of acquiescence in the settlement line, and probably as to the true location of the Blue hills. It undoubtedly proved the acquiescence of those who signed it, and who were proprietors under the respective patents; and if it was not conclusive as to that, it tended to raise a presumption that the line was upon or near the Blue hills mentioned in the Rochester patent, as it cannot be supposed that the proprietors of that patent would have voluntarily acquiesced in a line which would deprive them of eighty thousand acres to which they supposed they had a legal title. The deed was, therefore, properly received in evidence.
A map and survey, which were found among the records of the town of Rochester, dated on the 10th of November, 1786, shortly after the settlement line had been run, describes that, as the line between Rochester and the great (Hardenburgh) patent. A deed from the trustees and two freeholders of Rochester for land in that town, dated on the 2d of June, 1787, describes one of the boundary lines as running to a maple tree, standing in a line of marked trees on the settlement line, "being the division line between Rochester and the great patent." The same line is recognized in a deed from the trustees and two of the freeholders of Rochester to Doctor Kierstead, dated on the 21st of June, 1784. That purports to have been given in consideration that some land which the trustees had previously conveyed to Jacob Kline, and which he had conveyed to Doctor Kierstead, had, "by settling the division line between the township of Rochester and the great patent, fallen into the great patent." The town records of *Page 289 
Rochester contain statements that the trustees refunded money to Jochum Schoonmaker and Johannis Osterhout, junior, severally, because portions of the lands previously conveyed to them by such trustees had, by reason of fixing the settlement line fallen within the Hardenburgh patent. It was proved that Robert L. Livingston had given upwards of ninety leases, between 1807 and 1829, for various parts of lot number four, lying between the now controverted lines, and that the tenants had personally occupied the demised premises, and it was further shown that he had sold timber standing on different parts of that lot, at various times between 1828 and 1843 which was cut up to the settlement line. Among the leases executed by Livingston, of parts of lot number four, east of Neversink river, there were two to Neal Benson, under whom the defendants claim a right to cut the timber in question in this action, but the terms in those expired before the commission of the alleged trespasses. A surveyor testified that he ran on the agreement line in 1803, and that since that date the owners of the Hardenburgh patent cleared the land up to said line, and that he never knew the trustees of Rochester to claim west of it until lately. All this evidence was adduced to prove a recognition of and an acquiescence in the settlement line by the proprietors of the Rochester patent. The defendants' counsel objected to the admission of such evidence as affecting the rights of the cestuis que trust on the ground that they had not, individually, any power to resist encroachments. But those who had previous grants of land, extending west of that line, and it was in evidence that there were such grants to individuals, had the power to contest the line, and they were not concluded by the action of the trustees subsequent to the acquisition of their titles. But so far from making any resistance, they claimed and accepted from the trustees compensation for the portions of land granted to them extending west of the line. So far as related to the lands held by the trustees at the time when the line was run, if a majority of the cestuis que trust were opposed to the line, they might at any time have elected trustees of the same opinion, *Page 290 
who would have adopted measures to resist the alleged settlement of their boundary line. I conceive, therefore, that the evidence was competent, even if the cestuis que trust had not been concluded by the action of their trustees.
Some technical objections were raised to the certificates of the proof of several of the deeds, but they were overruled, and, as I think, properly, because they were introduced to prove the proper location of a boundary line, when the fact that they had long been held as muniments of title warranted their introduction without any formal proof of their execution, and, secondly, such certificates were valid for the reasons which I shall presently assign in reference to some of the plaintiffs' title deeds.
The judge charged the jury that if they should find from the evidence that the settlement line had been recognized and acquiesced in as the western bounds of Rochester, by the trustees holding the legal title, and the inhabitants of the town for whose use the trusts in the deed were created, and who were the persons beneficially interested: that the proprietors of the Hardenburgh patent, or that part of it which bounded on the Rochester patent, and the trustees of Rochester had, in 1776 or 1778, agreed upon a line, and that line is what is called the settlement line, and if all the parties have acquiesced in it for a period of twenty-five years, or from that time until the commencement of this suit, claiming up to it on both sides, and recognized it as the true line, it cannot now be disturbed. This part of the charge is fully sustained by what was said by Chancellor WALWORTH, in the case of Adams v. Rockwell (16Wend., 302), decided by the Court of Errors in 1836.
When so extensive a line as that between the two patents in question, and run with so much publicity, and so distinctly marked, has been acquiesced in, and indeed generally recognized by all interested in it for so long a period as had elapsed in this case, numerous titles must have been taken and passed through many hands, lands must have been cleared, improvements must have been made, and there have probably been many family arrangements, and all upon the supposition *Page 291 
that the line had been irrevocably fixed, and could not be disturbed. To allow the question as to the location of such a line to be agitated anew, after the lapse of so long a period, would be productive of much litigation, and possibly of great injustice. On sound principles of justice as well as of policy, the rule admitted by Chancellor WALWORTH in Adams v.Rockwell, and laid down in effect by the judge at the time of this action, should be sustained.
Many questions were raised as to the admissibility in evidence, and effect, of various documents introduced by the plaintiffs, to prove and establish the chain of title from the original proprietors of the Hardenburgh patent down to Mrs. Hunt. I shall consider such of them as I deem material.
It was objected to the deed from Philip Rokeby to May Bickley, that its date was antecedent to that of the patent, and that its execution by the grantor was not sufficiently proved, according to the certificate of the officer taking the proof. The patent is dated on the 20th of April, 1708, in the seventh year of the reign of Queen Anne, and the deed is dated on the 12th of January, 1708, in the seventh year of that Queen's reign. According to the old style which then existed, and continued until 1752, the year commenced on the 25th of March, and Queen Anne ascended the throne on the 8th of March, 1702. In both the year of the Christian Era, and of her reign, April preceded January. Besides the deed recited the patent, and referred to its date.
The proof of the execution of the deed was taken by a member of the King's council, and it was contended that he had not the requisite authority. Title deeds dated subsequently to the act of 1771 were usually proved or acknowledged before members of the King's council. By an act passed on the 12th of December, 1753, relative to mortgages of real estate, members of His Majesty's council are named, *Page 292 
with others, as acknowledging officers, and the act of 1771 refers to the previously existing custom of acknowledging and proving the execution of deeds before such members, and sustains it. I think that, under the circumstances, it is to be presumed that they had the requisite authority.
It was also objected that the certificate simply states that the witness declared that he saw the grantor execute the deed. There was not at the time any statute providing what should be stated in the certificate. Under the circumstances, it may be reasonably inferred that the declaration of the witness was made under the solemnity of an oath; and if so, the proof was sufficient. It was further objected, that the record of the deed was not competent evidence, as the act of 1710, making the transcript evidence, only refers to such deeds as had been acknowledged and recorded, and not to those the execution of which had been proved. But I think that the words, "acknowledged and recorded," may be fairly interpreted to include all such as had been duly recorded, whether their execution by the grantees had been proved or acknowledged. The first section of the act of February 26, 1788, making the record of all deeds executed before or after its passage, "being" duly acknowledged or proved, evidence, refers to those previously acknowledged or proved, as well as executed, and that would remove the difficulty (if any) arising under the act of 1710 from the circumstance that the deed in question had been proved and not acknowledged.
It was objected to the admission of the exemplification of the will of May Bickley, dated in 1716, that the proof was taken by the Governor of the Province, and also that but one of the witnesses was examined. The Governor was authorized to take the proof of wills under a colonial act passed in 1691. What proof should be required, was not specified in the act. The colonial act of the 6th of May, 1691, merely required that all wills in writing, purporting to convey lands, should be attested by three or more credible witnesses, but makes no provision as to the manner of proving them. In the absence of any statutory regulations, the common law rule must control. By the *Page 293 
common law, it was not necessary to call all the attesting witnesses to prove the execution of a will of real estate: one would answer, if he could prove a compliance with all the statutory requisitions. (Jackson v. Vickory, 1 Wend., 412, 413, and the authorities there cited by Judge SUTHERLAND.) In this instance, such compliance was proved by the witness.
It was objected to the certificates of proof of the execution of the deed from Elizabeth Bickley to Robert Livingston, dated on the 13th of February, 1741; from Margaret Nottingham to Anna Garton, dated on the same day; from Anna Garton to Robert Livingston, dated on the 14th of November, 1741; from James Graham to Gulian Verplanck, dated the 27th of February, 1741; from Anna Garton to Gulian Verplanck, dated November 14, 1741; from Peter Fauconier to Robert Livingston, dated the 13th of May, 1742; from Johannes Hardenburgh and others to Robert Livingston and Gulian Verplanck, dated 16th November, 1749; and from Gulian Verplanck to Robert Livingston, dated on the 12th of December, 1749; that such certificates did not state that the officer taking the proof was acquainted with the witnesses, or that they knew the grantees as the persons described in the deed. Previous to the act of 11th February, 1797, there was no statute requiring that it should be stated in the certificate that the officer knew the witnesses, or that they knew the grantors. When a public officer certifies that proof was made before him by a particular person, that implies that the officer knew, or was satisfied as to the identity of, the witness; and when a witness swears that he saw an individual execute a deed, it is inferable that he made his statement from personal knowledge. It is much in favor of the validity of these certificates, that some of them were granted by Chief Justices De Lancey and Horsmanden and Judge Phillipse, of the Supreme Court. It is fairly inferable that they knew the existing law, and conformed to it. A practice, pursued by such eminent jurists, and which, so far as my examination has extended, was generally adopted, must be deemed to be legal and proper, and especially in the absence of any contradictory statutory regulations *Page 294 
It was objected to the deed from Johannis Hardenburgh and others to James Graham, dated the 6th of September, 1729, that it was not a conveyance of land so that an exemplified copy of it could be received in evidence, and that it expressed no consideration. It was a covenant to convey land, and in fact conferred an equitable title, and it was therefore within the recording act. The seal imported a sufficient consideration to sustain a covenant, and besides the objection of a want of consideration, if available at all could only be so when raised by the covenantor or some one claiming under him.
It was objected to the exemplification of the will of William Nottingham, dated on the 7th of December, 1730, that the description of the officer before whom the will was proved was fatally defective. His certificate describes him as Edward Whittaker, being thereunto (taking the proof of wills) delegated and appointed by William Burnet, Esq., late governor of New York, and continued in office by the then Governor Montgomerie. The Colonial act of 1692, to which I have before alluded, authorized the Governor, or any one to whom he should delegate the power, to take the proof of wills. It seems to me quite clear that the certificates set forth sufficient to show that Whittaker had been duly appointed to the office of delegate and was then lawfully engaged in the discharge of its duties.
The objections raised to the admission in evidence of the deeds from Mary Livingston and others to Margaret Maria, wife of Robert L. Livingston, dated October 6th, 1813, were that the acknowledging officer did not certify that he knew that the persons who made the acknowledgment were the individuals who had executed the deeds, or that the officer, who was a county judge, was a counsellor of the Supreme Court, so as to make it evidence in another county. The certificate states that the officer knew those who made the acknowledgment to be the persons described in the deed. He could only certify that they were known to him to be the individuals who had executed the deed from their acknowledgment that they had done so, and that is stated. It seems to *Page 295 
me that the act (1 R.L. of 1813, 369, § 1), in directing what shall be inserted in the certificate requires nothing more in reference to the acknowledging officer's acquaintance with the identity of the parties than what is stated in this instance. It was so decided in the case of Jackson v. Gumaer (2 Cow.,
552). As to the other objections, the act provided (1 R.L.,
371, § 5), that every deed, conveyance or writing so acknowledged or proved (before, among others, any judge of a Court of Common Pleas) whether the same be recorded or not, or the record thereof, c., might be read in evidence in any court of this State, without further proof thereof. The act requiring the certificate of a county clerk to verify the official character and acts of an acknowledging county judge, who was not of the degree of counsellor at law in the Supreme Court, in order that the deed might be recorded in another county, was not passed until in the year 1818, and did not apply to deeds antecedently executed and acknowledged or proved. Nothing was said in that act in reference to reading deeds thus acknowledged or proved, in evidence in other counties than those in which the acknowledging officers resided. The Revised Statutes of 1830 first provided that, when any conveyance should be proved or acknowledged before any judge of the County Court, not of the degree of counsellor at law in the Supreme Court, or any commissioner of deeds it (referring to its antecedent, the conveyance which shall be proved or acknowledged) should not be entitled to be read in evidence in any other county without the clerk's certificate (1R.S., 759, § 18). The words used in the statute, ("shall be proved or acknowledged") show that the provision was intended to apply to such deeds as should be thereafter proved or acknowledged, and not to deprive any claiming under existing deeds of a privilege already acquired. The laws of 1813 made all deeds, proved or acknowledged, pursuant to the then existing statutory provisions, competent evidence in any court in this State, and that privilege was not taken away or altered in reference to such deeds by the provisions of the act of 1818 or of the Revised Statutes. *Page 296 
The deed from William Slosson to Robert L. Livingston, dated on the 11th of June, 1817, could not be considered as contravening any trust specified in a deed of the same date from Livingston and wife to Slosson, as the two deeds were executed at the same time, and the deed to Slosson expressly referred, for its objects, to the deed then executed by him. The whole was one transaction. The power to execute the identical deed from Slosson was conferred upon him in express terms by the deeds to him. It is unnecessary to decide whether, if there had been any violation of the trust confided to Slosson, the objection could have been available to any stranger, or to any one except the cestuis quetrust, or those claiming under them.
It was objected to the deed from James Schott, Jr., and Margaret M., his wife, and St. George Croghan and Cornelia A., his wife, to the plaintiff, Elizabeth A. Hunt (then Elizabeth A. Ridgely), dated June 9th, 1849, that it was executed by Schott for himself and his wife under a power of attorney from her to him, which was invalid. The deed recited that Cornelia L. Ridgely, then deceased, was, in her lifetime, the owner in fee simple of certain lands (of which the premises in dispute were a part); that the same had descended to the three ladies as her heirs at law; that they and the husbands of two of them had agreed that partition of such lands should be made by three persons named; that such partition had been made, and certain land (including the premises in dispute) had been allotted to the said Elizabeth A. Ridgely; and such deed purported to convey to her all the rights of Schott and wife, and Croghan and wife, in and to such premises. There were also adduced in evidence, a previous written agreement of the parties to the deed, that partition should be made by the persons named for that purpose; the report of these persons making such partition, and allotting the lands which the last mentioned deed purported to convey or release to Elizabeth A. Ridgely, and the assent in writing of the said parties, dated April 28th, 1849. It seems to me that these documents which (as no objection to them was raised) must have *Page 297 
been, as to the first and last, duly executed by Mrs. Schott, vested in the then Miss Ridgely the title to the lands allotted to her in severalty, without any deed or release from her sisters and their husbands. It was decided in Jackson v. Harder (4John., 202), that even a parol partition, carried into effect by possession taken according to it, is sufficient to sever the possessions as between tenants in common, whose titles are distinct, and when the only object of the division is to ascertain the separate possessions of each. A similar principle was admitted in Jackson v. Bradt (2 Caines, 174). Our statutes to protect the property of married women assuredly authorizes them to make partition, with the assent of their husbands, when they have an estate in the lands.
If the partition in this case was effectual, it is quite immaterial whether the power of attorney from Mrs. Schott to her husband, was valid or void. If, however, the power was invalid, and the partition was ineffectual, without deed or release, still such deed conveyed to the grantee the one-third part of the premises previously belonging to Mrs. Croghan, and the third part, which had belonged to Mrs. Schott, during the lifetime of her husband, and the remaining third part had been and was her own property. She could, therefore, maintain an action for cutting down and carrying away trees standing on the premises, even if Mrs. Schott had been entitled to a remainder in a part of the lands after the termination of the freehold estate in her husband. The objection as to that, if of any avail, could only have gone to the amount of the damages and it was not urged upon that.
The chain of title from the original proprietors of the Hardenburgh patent to the plaintiff was, I think, sufficiently proved by competent evidence.
The counsel for the defendants insisted, on the trial, that as the owners under the Hardenburgh patent, and the trustees of Rochester had made no settlement of the boundary by deed, their title must be confined to the land actually occupied, and that acquiescence (in a line) cannot affect a wild, unoccupied lot; and requested the judge so to charge the jury. He refused *Page 298 
to do so, and the counsel excepted to his decision. He had previously instructed the jury that if they were not satisfied that the Blue hills east of the Neversink river were the westerly bounds of the Rochester patent, designated in the patent; or that there had been an uninterrupted recognition and acquiescence in the line known as the settlement line, by the trustees of Rochester, holding the legal title, and their grantees, and by the inhabitants of Rochester, the cestuis que trust of the lands inclosed within the bounds of the original Rochester grant, they should find a verdict for the defendant. In refusing to charge as specifically requested by the defendants' counsel, he referred to what he had previously said in his instructions to the jury. In the part of his charge which I have quoted, he had said all which the defendants had a right to demand. There can be no doubt but that a line run with the full knowledge of all the adjoining owners, or under circumstances from which such knowledge may be reasonably inferred, clearly designated and generally recognized and acquiesced in by those concerned by repeated and unequivocal acts for so long a period, must control and cannot be disturbed, whether it passes through cultivated or wild lands. It would be most unreasonable to deny to the owners of uncultivated and wild lands the right to settle their common boundary line, and if they can do that by positive agreement, such agreement may be inferred from their unequivocal acts, and is as operative when thus proved as if it had been inserted in a deed. In such cases the establishment of a line is not deemed to be, nor does it acquire validity as a conveyance of a new title, but it simply ascertains and determines the extent of lands held under preëxisting titles.
The defendants' counsel also requested the judge to charge the jury that the denial of the right of the patentees of the Hardenburgh patent to hold up to the line was sufficient as the case stood, especially as connected with repeated denials of the validity of the settlement line by many other inhabitants of Rochester, to show a non-acquiescence in the line. The judge refused to comply with such request, and I think *Page 299 
correctly. He could not, with propriety, say that simple denials were more effective than clear, unequivocal acts. The weight of such denials might have been submitted to the jury if the judge had been requested to do so, but he was not; on the contrary, he was requested to instruct the jury to give them conclusive effect. Besides, such denials were generally, if not altogether, of recent date, and made after a sufficient time had elapsed for the establishment of the line.
The judgment should be affirmed.
Judgment affirmed.